[No. C030298. Third Dist. Dec. 21, 2000.]

KYLE O., Plaintiff and Appellant, v.
DONALD R. et al., Defendants and Respondents.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of part II.

## COUNSEL

Julie E. Mumma for Plaintiff and Appellant.

Eldridge & Eldridge, Richard A. Eldridge; MacKenzie & Brody and R. L. MacKenzie for Defendants and Respondents.

## OPINION

**SCOTLAND, P. J.**—After Kimberly O. died while proceedings were pending with respect to the dissolution of her marriage to Kyle O., Kimberly's parents, Donald and Rosemary R., sought a court order giving them a visitation schedule with their granddaughter, Rachel O.[1] (Fam. Code, § 3102.) The trial court granted them visitation with Rachel one weekend every month, one week in the summer, one week for their family reunion, and on Mother's Day and Christmas Eve.

On appeal, Kyle contends the visitation order must be reversed because the statute that authorized it, Family Code section 3102, is unconstitutional. In the alternative, he claims the trial court abused its discretion in ordering visitation in light of what he asserts is the "pervasively hostile and harmful" situation that the grandparents have "created." Lastly, Kyle argues the court erred in awarding them $7,000 in attorney fees.

While the appeal was pending, the United States Supreme Court issued its decision in *Troxel v. Granville* (2000) 530 U.S. 57 [120 S.Ct. 2054, 147 L.Ed.2d 49]] (hereafter *Troxel*), which addressed a parent's challenge to a Washington statute that permits visitation by a nonparent if the visitation is in the best interest of the child. Although concluding the fundamental liberty

---

[1]In an effort to avoid confusion, we will refer to the parties by their first names and, where appropriate, will refer to Donald and Rosemary R. collectively as "the grandparents."

interest protected by the due process clause of the Fourteenth Amendment extends to the interests of parents in the care, custody, and control of their children, the court declined to hold that nonparental visitation statutes violate the due process clause as a per se matter. (*Id.* at pp. 64-65, 73 [120 S.Ct. at pp. 2059-2060, 2062-2063, 147 L.Ed.2d at pp. 56, 61.) The court held, however, that Washington's nonparental visitation statute was unconstitutional as applied to the circumstances of that case.

Following the lead of *Troxel*, we need not decide whether California's nonparental visitation statute, Family Code section 3102, is unconstitutional on its face because, as we shall explain, its application in the present case unconstitutionally infringed upon fundamental parenting rights.

Hence, we conclude the trial court erred in ordering grandparent visitation under the circumstances of this case, and further conclude the attorney fee award must be set aside because it was influenced by the court's erroneous belief that Kyle was not justified in resisting the visitation order. Accordingly, we shall reverse the judgment.

## FACTS

An extensive summary of the facts is necessary to shed light on our conclusion that, as applied to the facts of this case, Family Code section 3102 unconstitutionally infringes upon Kyle's fundamental right to make decisions concerning the care, custody, and control of his daughter, Rachel.

Rachel was born in June 1992. Her mother, Kimberly, was diagnosed with cancer in May 1993. During Kimberly's illness, her parents and Kyle's parents helped care for Rachel.

In June 1994, Kyle filed for dissolution of his marriage to Kimberly.[2] The following month, the grandparents, who were seeking the right to visitation with Rachel, were joined as parties in the dissolution action. The trial court granted Kyle and Kimberly joint legal and physical custody of Rachel, with Kyle having her Friday morning to Sunday afternoon, and Kimberly having

---

[2]According to a psychological evaluation report, Kyle claimed he filed for dissolution after he was told by several persons that Kimberly had been abusive to Rachel. Kyle asserted that Rachel's pediatrician and the family's marriage counselor had made child abuse reports to Child Protective Services (CPS), and CPS had advised Kyle that he needed to remove Rachel from Kimberly's care or he could lose custody of Rachel for failing to protect her. CPS apparently denied advising Kyle to separate from Kimberly. The grandparents denied that Kimberly abused Rachel, but acknowledged that Kimberly was upset and under the influence of drugs during her terminal illness, and that she expressed anger toward Rachel. Kyle's parents said that Kimberly had a lot of anger and thought her pregnancy caused the cancer, which caused part of her anger toward Rachel.

her the remainder of the time. The court found it was in Rachel's best interest to have contact with the grandparents and granted them visitation during the time Kimberly had Rachel. Recognizing Kimberly's death was imminent, the court ordered Kyle and the grandparents to mediate the issue of grandparent visitation, particularly for the days immediately following Kimberly's death.

After mediation, Kyle and the grandparents reached a temporary agreement that, in the event Kimberly was unable to exercise her custodial time, the grandparents would have Rachel during that time. The court awarded custody to Kimberly on weekdays from 11:00 a.m. until 5:00 p.m. On Wednesdays, Kimberly would have Rachel until 8:00 p.m. The court further ordered that the grandparents would have Rachel from 11:00 a.m. to 5:00 p.m. on weekdays for a minimum of one month after Kimberly's death. The court believed this was better than upsetting Rachel's routine and "dumping her into a day care situation" right after the death of her mother. It also ordered Kyle and the grandparents to return to mediation if they could not establish a visitation schedule thereafter.

Kimberly died in August 1994. According to the grandparents, near the end of the one-month period following Kimberly's death, Kyle asked them to suggest a new visitation schedule. Rosemary responded that they wanted to continue visitation on Monday through Friday from 11:00 a.m. to 5:00 p.m.

When Kyle did not agree to the amount of time they wanted, the grandparents sought a court order pursuant to Family Code section 3102, which authorizes certain relatives of a deceased person to seek and obtain visitation with the decedent's child if it is in the child's best interest. In their "PETITION FOR VISITATION," the grandparents did not allege that Kyle is an unfit parent; they simply asserted that visitation would be in Rachel's best interest but that Kyle would not allow them any visitation without a court order.

Kyle opposed the petition, arguing Family Code section 3102 is unconstitutional. He also asserted that, if the trial court found the statute to be constitutional, a weekend or weekend day per month at most would be an appropriate amount of visitation.

At the initial hearing, the grandparents indicated they wanted custody of Rachel. The court ordered psychological evaluations of all the adults, directed them to return to mediation regarding visitation, and gave the grandparents temporary "custodial time" with Rachel on Monday through Thursday between 11:00 a.m. and 5:00 p.m. because the court thought it was not

in Rachel's best interest to abruptly terminate the existing schedule. The court then consolidated the visitation action with the dissolution proceeding, which had not been finalized due to remaining property issues. The grandparents were involved in the resolution of some of the property issues because they alleged that they had an interest in Kyle's house, which was community property.

In reports filed with the court, Mediator Helga Kennedy recommended that Rachel have frequent and continual contact with the grandparents, including an extensive schedule of visitation on every other weekend, other specified days throughout the year, and two 1-week vacations. Kennedy urged Kyle and the grandparents to attend "co-parenting" classes and learn to work together.

Psychological evaluations were submitted to the court by psychologist Eugene Roeder, therapist Deanna Howarth, and psychologist Frank Leek.

Psychologist Roeder opined that Kyle possessed the abilities to "function in the role of a parent" and did not pose any risk of detriment to Rachel. Roeder found that Kyle had adequate parenting skills but would not function well in a shared parenting arrangement because he was suspicious and distrustful. In Roeder's view, "[t]he current antipathy between the parties has little to do with Rachel and much more to do with who will have control over funds which, under ideal conditions, would be utilized to promote her development."

Roeder also opined that the relationship between Rachel and the grandparents was an important one that needed to be preserved and maintained. He recommended they have a visitation schedule of one day each week after daycare, one weekend a month, and some Christmas, birthday and vacation time with Rachel.

In a later assessment, Roeder reported that Kyle believed the grandparents were behaving in a manner detrimental to Rachel and, thus, Kyle opposed any unsupervised contact between them and Rachel. Kyle felt the grandparents were untrustworthy people who were living in his house and brainwashing his daughter, and believed visitation with them interfered with Rachel's development and with Kyle's relationship with her. Roeder opined that Kyle and the grandparents needed counseling but that there was a very low probability of success due to the breadth and depth of the animosity they exhibited.

Howarth, who was Rachel's therapist, opined that Rachel and Kyle had a high level of bonding. According to Howarth, Rachel appeared to be happy

with Kyle and was "somewhat anxious about being separated from him." Howarth noted that Kyle's demeanor with Rachel was affectionate, loving and gentle. Howarth recommended visitation with the grandparents as requested by Rachel.

In a subsequent assessment, Howarth reported that Rachel had exhibited increased anxiety when out of Kyle's presence; had said the grandparents told her "Daddy doesn't love her"; had stated vehemently during a counseling session that, "My daddy loves me!"; and had refused to answer a question about the grandparents. Howarth urged the grandparents to seek counseling in order to work in a cooperative manner with Kyle.

Psychologist Leek initially reported that the grandparents wanted extensive visitation with Rachel because they represented Rachel's sole contact with her deceased mother, Kimberly; Kyle believed the grandparents had stolen his house and money and were attempting to alienate Rachel from him; and Kyle felt there were limitations to the grandparents' rights, and wanted them to have only infrequent supervised visits or no contact at all. Noting Kyle was "a bright, energetic, articulate individual who has a responsible position in the community," Leek recommended that Kyle and the grandparents work together "to develop a method of communication that will permit them to discuss Rachel's needs appropriately and to share information."

In a later report, Leek observed that Rachel had positive relationships with Kyle and with the grandparents, but that Kyle and the grandparents "emotionally [were] still entrapped in a system that [was] not in Rachel's best interest," the degree of conflict intensified as the court dates approached, and it was difficult for Rachel to cope with this conflict.

In his final report, Leek took note of therapist Howarth's opinion that Kyle was "following through well on his parenting [of] Rachel" and Rachel also had a positive relationship with the grandparents. But Leek recounted the continuing conflict between Kyle and the grandparents. According to Leek, there were "three possible avenues . . . to extricate Rachel from the conflict in which she is now central: to stop all maternal grandparent/grandchild interaction; to terminate [Kyle's] parental rights and place Rachel with the grandparents or in the home of another relative; or to maintain the current grandparent involvement and continue whatever avenues are possible to reduce the conflict." Leek opined that the first two options were drastic and in the long run would be detrimental to Rachel; thus, the third option was the only viable one for meeting Rachel's best interests. Leek recommended a visitation schedule similar to the one ultimately adopted by the court.

It appears that some form of court-ordered visitation was in effect at all times between Kimberly's death in August 1994 and the commencement of trial three years later in September 1997. At trial, the reports of Roeder, Howarth, and Leek were admitted and considered by the court.

Rosemary testified about the large amount of time that the grandparents spent with Rachel during Kimberly's illness and during Kimberly's custodial time with Rachel after Kyle and Kimberly separated. She acknowledged that Kyle's parents also looked after Rachel during Kimberly's illness.

Rosemary was willing to agree to the recommendations of mediator Kennedy and psychologist Leek that the grandparents continue to have visitation with Rachel during the week, on certain weekends, on other specified days, and for some extended time in the summer. She believed that the proposal Kyle had set forth in his pretrial statement (the grandparents could see Rachel every other month with an extended visit in the summer as long as visitation did not interfere with her Sunday school, sports, or extracurricular activities) was not in Rachel's best interests. After testifying that Kyle had said he would be pleased if Rachel never saw the grandparents again, Rosemary stated she would like to have a more normal and spontaneous relationship with Rachel without court interference, which she conceded would be in Rachel's best interests, but she did not trust Kyle to allow this to happen.

Rosemary complained that, after Kimberly's death, Kyle wanted to maintain all control over his daughter, including what she ate and wore. Rosemary wondered "[w]hy all of a sudden do we have to have specific orders when we[']re grandparents?" She believed that Kyle was excessively controlling.

Rosemary was questioned about a conflict the grandparents had with Kyle on Rachel's third birthday, which had fallen on one of the grandparents' regularly scheduled visitation days. Two days before, Kyle told them they could have Rachel for two hours on her birthday, but it would have to be in the morning. Rosemary did not protest or disagree with Kyle; she simply phoned her attorney to confirm that the grandparents were entitled to visitation. On Rachel's birthday, Rosemary picked her up from preschool contrary to Kyle's wishes and without informing him that she was going to do so. When preschool employees advised Rosemary that they needed to contact Kyle regarding who had authority to take Rachel, Rosemary told them she had a court order allowing her to take Rachel and, if Kyle had a problem, he could call his attorney. She then left with Rachel without waiting while the preschool contacted Kyle. According to Rosemary, she did not wait because

nobody expressly asked her to wait. Kyle, who had a special birthday lunch planned for Rachel, obtained a court order requiring the grandparents to return Rachel to him after two hours. Rosemary denied that Kyle, Rachel, or anyone at the preschool told her about the special lunch plans.

Lisa Carr, the executive director of Rachel's daycare center, testified about Rachel's third birthday, stating Kyle had informed Carr that he would pick Rachel up from preschool for a special birthday lunch and that Rachel knew about the special lunch. Carr advised the assistant director, Sandy Carlson, about Kyle's plans. When Carr learned what had happened with Rosemary, she called Kyle.

Carr also testified that, during an impromptu conversation shortly after Rachel began attending daycare, Rosemary told Carr that, if Rosemary had her way, she would get sole custody of Rachel and Kyle would never see her again. Carr was shocked by this and told Kyle. Rosemary did not recall making this comment to Carr.

The trial court also heard about the following conflict that occurred between Kyle and the grandparents regarding Rachel's preschool graduation.

Rosemary testified that the grandparents had agreed to switch their June visitation from the second weekend to the first because their regularly scheduled second weekend conflicted with Father's Day. After making this agreement, Kyle telephoned in May and asked if they could switch again because Rachel's preschool graduation was the first weekend in June. The grandparents agreed to switch the first weekend with the fourth, but told Kyle they did not want this weekend to coincide with their vacation week of visitation. According to Rosemary, the parties "didn't work it out. I said I would give him something and [Kyle] wasn't giving me anything in return." Problems ensued, and Rosemary said the visitation did not get switched because Kyle failed to agree to exchange visitation time in the manner that the grandparents requested. Thereafter, the grandparents obtained an ex parte order entitling them to visitation with Rachel on the weekend of her preschool graduation. In their application, they did not mention that Rachel's preschool graduation fell on that particular weekend.

Rosemary admitted that it was in Rachel's best interest to attend preschool graduation with Kyle, and that she "would not have wanted Rachel to miss her graduation, not for anything," but explained that the grandparents had to obtain the ex parte order because Kyle failed to work things out with them. When Kyle refused to comply with the court order and took Rachel to her preschool graduation, the grandparents pursued contempt proceedings against him.

Rosemary acknowledged that, in June 1997, the grandparents sought to have Kyle held in contempt for failing to provide them with a copy of Rachel's medical card when in fact he had already given them a copy of the card. They also alleged that Kyle had neglected to give them a permission slip for emergency treatment when in fact he had given them a signed medical authorization in November 1996. According to Rosemary, the authorization Kyle gave them "wasn't an acceptable letter."

Rosemary also acknowledged that the grandparents had filed papers in an attempt to gain custody of Rachel, and that Rosemary had declared Kyle was sexually deviant and posed a serious threat to Rachel's safety and well-being. She then admitted that she did not think Kyle was a threat to Rachel and that the grandparents had dropped their custody action. They did not make any allegations of parental unfitness in their petition for visitation.

Rosemary denied that her declaration filed in the custody action could be construed as an allegation that Kyle possibly would harm his daughter or had sexual inclinations toward Rachel, and denied that she owed him an apology for making the accusation or for seeking custody of Rachel. She conceded the grandparents' accusations contributed to Kyle's hostility.

Joan O., Rachel's paternal grandmother, testified that court-ordered visitation had caused problems and interfered with her time with Rachel as well as with Rachel's activities. For example, Joan had to cancel a trip to take Rachel to visit her 91-year-old great-grandmother because it conflicted with the maternal grandparents' court-ordered visitation. On other occasions, Rachel had to miss some swimming lessons. Joan also noted that Rachel's overnight visits were stressful for Rachel because she did not like to be away from her father after losing her mother. Joan preferred to see a more flexible plan for visitation. Her visits with Rachel tended to be more spur of the moment, although some were scheduled around Rachel's activities and the maternal grandparents' court-ordered visitation. She deferred to Kyle's parental decisions and did not think the amount of contact with Rachel was as important as the quality of the contact.

Rachel's therapist, Deanna Howarth, testified that Kyle had a very good relationship with Rachel. He was a loving father, who was "very on track of what's healthy and helpful for [Rachel]." According to Howarth, it is "beautiful to watch the relationship that they have." Howarth noted the grandparents also had a very loving relationship with Rachel.

Howarth had observed some harm suffered by Rachel as a result of the relationship between the grandparents and Kyle. Howarth opined that Rachel's anxiety would be alleviated if Kyle were given more control over

visitation. Howarth observed that, because Kyle was a working parent, he had less time with Rachel and his quality parenting time was reduced due to the visitation schedule. Noting that Kyle was upset because he felt the court-ordered visitation of one weekend a month deprived him of a quarter of his quality parenting time, Howarth opined that Kyle's feelings were justified.

According to Howarth, the parent-child relationship should take the "lead role" over the grandparent-grandchild relationship. The fact that Rachel's mother was dead did not mean Rachel needed greater contact with her maternal grandparents; rather, she needed to have a normal relationship with them during which they could help to keep the memory of her mother alive. Howarth replied in the negative when asked whether she could say it was not in Rachel's best interest to have visitation of one weekend a month with the grandparents. Opining that it would be harmful to cut off all visitation, Howarth believed that Kyle would permit the grandparents to continue to see Rachel without a court order. He had told Howarth that he knew it was important for Rachel to see her maternal grandparents. Howarth felt that all three people wanted what was best for Rachel, but they had "let their hurt and anger get in the way."

Kyle testified that he believed the amount of visitation the court previously had ordered cut into his quality parenting time, which occurred on weekends. He disagreed with court-ordered visitation and believed that, as Rachel's parent, he should determine when and how often she saw other people.

Contrary to what he had told psychologist Leek, Kyle testified that he agreed the grandparents needed to be involved in Rachel's life, that they loved her, and that their role was becoming increasingly positive. He thought the grandparents should be able to see Rachel in the same fashion that his family saw her, which depended upon his and Rachel's schedule. Kyle believed this could happen and his conflict with the grandparents would diminish in the absence of court-ordered visitation. He stated that he would allow them to have spontaneous visits with Rachel as long as they did not make negative comments about him to others as Rosemary did to Carr, or create problems like the grandparents had about Rachel's preschool graduation and third birthday. He asserted that Rachel could continue to see the grandparents even if visitation were left completely to his discretion. If the court felt it necessary to order visitation, Kyle preferred only one overnight visit a month, along with other spontaneous visits.

Kyle denied telling the grandparents that he did not want them to see Rachel or threatening to cut off visitation. He simply believed that, as her

father, he should be the one to determine the degree of contact, taking into consideration Rachel's wishes, and that the court should not be involved. He did not believe the grandparents should have the ability to supersede his taking Rachel to various activities, but he would be willing to notify them of activities in which Rachel was involved so they could attend. Kyle acknowledged that, during the last three years, he had not arranged for Rachel to see the grandparents outside of court-ordered visits.

Kyle disagreed with psychologist Leek's assertion that the most common interaction between Kyle and the grandparents was for Kyle to make accusations, call them names, and repeat issues involving the house. He acknowledged using the word "predators" to describe the grandparents, but said Leek had taken it out of context and incorrectly attributed use of the term to Kyle. According to Kyle, while Kimberly was in the hospital around April 1994, a member of the grandparents' family had warned Kyle that the grandparents were predators, did not care about him, and would try to get as much property and control as they could after Kimberly died.

After the question of visitation was submitted, the court turned to the property issues that were being contested. Following trial, the court issued an oral statement of decision. As to the property issues, the court found, among other things, that the grandparents did not have an enforceable interest in Kyle's house as they alleged. As to visitation, the court determined that, based upon the evidence submitted at trial, "it is absolutely vital to Rachel's welfare that she have an ongoing relationship with the [grandparents] through visitation." Hence, the court ordered visitation on the third weekend of every month from 4:00 p.m. Friday until 5:00 p.m. Sunday. If for any reason Rachel could not participate, the grandparents were entitled to see Rachel the following weekend. In addition, they were entitled to one week during the summer, one week during their annual family reunion, and from 9:00 a.m. to 7:00 p.m. on Mother's Day and Christmas Eve. The court further ordered that Rachel continue in therapy with Deanna Howarth, and that the grandparents and Kyle split the cost.

The court found it was important for Kyle to resume the normal father role and for the grandparents to resume the normal grandparents role, noting the visitation rights awarded to them were not intended to make the grandparents a substitute for Kimberly's role as mother. The court was bothered by the situation caused by the parties because of its effect on Rachel. It stated the visitation schedule was specific enough for the parties to rely on, but did not preclude them from reaching an alternate agreement if the parties desired. However, the court also stated it would enforce the terms of the order "so the [grandparents] will be absolutely entitled to the visitation that has been awarded and [Kyle] will be entitled to resume the role of father."

The court ordered Kyle to pay the grandparents $7,000 in attorney fees because he caused "somewhat more [of] the problems."

When Kyle's attorney asked about the constitutional challenge to the statute authorizing nonparent visitation, the court stated it was denied "[b]y implication."

## DISCUSSION

### I

The trial court awarded visitation to the grandparents pursuant to Family Code section 3102, which provides in pertinent part: "(a) If either parent of an unemancipated minor child is deceased, the children, siblings, parents, and grandparents of the deceased parent may be granted reasonable visitation with the child during the child's minority upon a finding that the visitation would be in the best interest of the minor child." (Further section references are to the Family Code unless specified otherwise.)[3]

■ Kyle contends section 3102 is unconstitutional in that it unduly interferes with a liberty interest protected by the Fourteenth Amendment of the United States Constitution and also violates the right to privacy set forth in the California Constitution. (Cal. Const., art. I, § 1.) We need not explore the protections afforded by California's Constitution because, as we shall explain, the application of section 3102 to this case unconstitutionally infringed upon a fundamental interest protected by the due process clause of the Fourteenth Amendment, the right of a parent to make decisions concerning the care, custody, and control of his child.

■ " 'In determining a statute's constitutionality, we start from the premise that it is valid, we resolve all doubts in favor of its constitutionality, and we uphold it unless it is in clear and unquestionable conflict with the state or federal Constitutions. [Citation.] A challenge to a statute's constitutionality must demonstrate that its provisions inevitably pose a present total and fatal conflict with applicable constitutional prohibitions. [Citation.] . . .' [Citation.]" (*Clare v. State Bd. of Accountancy* (1992) 10 Cal.App.4th 294, 303 [12 Cal.Rptr.2d 481]; see also *People v. Rodriguez* (1998) 66 Cal.App.4th 157, 166-167, fn. 8 [77 Cal.Rptr.2d 676].)

---

[3]The remainder of section 3102 provides: "(b) In granting visitation pursuant to this section to a person other than a grandparent of the child, the court shall consider the amount of personal contact between the person and the child before the application for the visitation order. [¶] (c) This section does not apply if the child has been adopted by a person other than a stepparent or grandparent of the child. Any visitation rights granted pursuant to this section before the adoption of the child automatically terminate if the child is adopted by a person other than a stepparent or grandparent of the child."

" 'A statute is not facially unconstitutional simply because it may not be constitutionally applied to some persons or circumstances . . . Unless it is in total conflict with the Constitution, any overbreadth is cured by a case-by-case analysis of the particular fact situation. [Citation.] . . . .' [Citation.]" (*Clare v. State Bd. of Accountancy, supra,* 10 Cal.App.4th at p. 304.)

Thus, even if a statute is not unconstitutional on its face, it may be unconstitutional as applied. " 'The practical effect of holding a statute unconstitutional "as applied" is to prevent its future application in a similar context, but not to render it utterly inoperative.' " (*People v. Rodriguez, supra,* 66 Cal.App.4th at p. 167.)

In *Troxel, supra,* 530 U.S. 57 [120 S.Ct. 2054, 147 L.Ed.2d 49], the United States Supreme Court held that a Washington statute authorizing visitation by a nonparent with a child was unconstitutional as applied to the circumstances of that case.

The facts in *Troxel* are similar to the facts in this case. After the father of two girls died, his parents sought court-ordered visitation with the girls pursuant to section 26.10.160(3) of the Revised Code of Washington.[4] The children's mother did not oppose visitation, but disagreed with the amount sought by the grandparents. (*Troxel, supra,* 530 U.S. at pp. 60-62 [120 S.Ct. at pp. 2057-2058, 147 L.Ed.2d at pp. 53-54].) In granting a visitation schedule of one weekend per month, one week during the summer, and four hours on the grandparents' birthdays, the superior court made only two formal findings: (1) the grandparents, as part of a large loving family, " 'can provide opportunities for the children in the areas of cousins and music,' " and (2) the children "would be benefitted from spending quality time with [the grandparents], provided that that time is balanced with time with the childrens' [*sic*] nuclear family.' " (*Id.* at pp. 62, 71-72 [120 S.Ct. at pp. 2058, 2063, 147 L.Ed.2d at pp. 54, 60].) The order was reversed on appeal, with the Washington Supreme Court ruling that the visitation statute infringed upon the fundamental right, under the federal Constitution, of parents to rear their children. (*Id.* at pp. 62-64 [120 S.Ct. at pp. 2058-2059, 147 L.Ed.2d at p. 55].)

█ Describing the interest of parents in making decisions about the care, custody, and control of their children as being "perhaps the oldest of the fundamental liberty interests" recognized by the court under the Fourteenth

---

[4]That section provided: "Any person may petition the court for visitation rights at any time including, but not limited to, custody proceedings. The court may order visitation rights for any person when visitation may serve the best interest of the child whether or not there has been any change of circumstances."

Amendment (*Troxel, supra,* 530 U.S. at pp. 64-65 [120 S.Ct. at p. 2060, 147 L.Ed.2d at p. 56]), the United States Supreme Court affirmed, holding the visitation statute was unconstitutional as applied to the facts of that case. Three factors weighed heavily in the court's analysis: (1) the "sweeping breadth" of the statute that "effectively permits any third party seeking visitation to subject any decision by a parent concerning visitation of the parent's children to state-court review" (*id.* at pp. 66-67, 72-73 [120 S.Ct. at pp. 2061, 2063-2064, 147 L.Ed.2d at pp. 57, 61]), (2) the fact there was no allegation or finding that the mother of the children was an unfit parent (*id.* at pp. 68-69 [120 S.Ct. at pp. 2061-2062, 147 L.Ed.2d at p. 58]), and (3) the fact there was no allegation or finding that the mother ever sought to cut off visitation entirely (*id.* at pp. 71-72 [120 S.Ct. at pp. 2062-2063, 147 L.Ed.2d at p. 60]).

*Troxel* pointed out "there is a presumption that fit parents act in the best interests of their children. . . . [¶] . . . Accordingly, so long as a parent adequately cares for his or her children (*i.e.,* is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." (*Troxel, supra,* 530 U.S. at pp. 68-69 [120 S.Ct. at p. 2061, 147 L.Ed.2d at p. 58].)

With this in mind, *Troxel* concluded the Washington superior court: (1) failed to accord the mother the presumption that she would act in the best interest of her children, (2) gave no special weight to the mother's determination of her daughters' best interests—instead, wrongly placing upon the mother the burden of disproving that visitation would be in the children's best interests, and (3) gave no weight to the mother having assented to some visitation, thus showing that the case involved nothing more than a simple disagreement between the superior court and the parent concerning her children's best interests. (*Troxel, supra,* 530 U.S. at pp. 68-73 [120 S.Ct. at pp. 2061-2064, 147 L.Ed.2d at pp. 58-61].)

*Troxel* held "the combination of these factors" demonstrated that the visitation order was an unconstitutional infringement upon the mother's right to make decisions concerning the care, custody, and control of her daughters and, thus, application of the visitation statute to the mother violated her fundamental liberty interest protected by the due process clause of the Fourteenth Amendment. (*Troxel, supra,* 530 U.S. at pp. 71-72, 74-75 [120 S.Ct. at pp. 2062-2063, 2064-2065, 147 L.Ed.2d at pp. 60, 62].)

 The same result is compelled in this case.

In seeking visitation with Rachel, the grandparents did not assert that the child's father, Kyle, was an unfit parent.[5] In fact, Rachel's therapist testified that Kyle was a loving father and "very on track of what's healthy and helpful for [Rachel]."

Because the trial court did not make any finding that Kyle was an unfit parent, Kyle is entitled to a presumption that he will act in his child's best interests, and his decision regarding the amount of visitation and his preference for a less structured and more normal and spontaneous manner of visitation must be given deference. (*Troxel, supra,* 530 U.S. at pp. 68-69 [120 S.Ct. at pp. 2061-2062, 147 L.Ed.2d at p. 58]; see §§ 3103, 3104.)

Kyle agreed that visitation was appropriate, agreed that Rachel needed a relationship with the grandparents, and agreed to allow visitation with them; he only contested their right to specify the amount and timing of the visitation. Kyle simply wanted Rachel to have a more flexible and spontaneous relationship with her maternal grandparents, such as she had with her paternal grandparents. Rachel's therapist acknowledged that this type of relationship is optimal, and she believed that Kyle would permit the grandparents to see Rachel because he had expressed awareness of the importance of Rachel's relationship with them. In the therapist's view, the absence of court intervention would lessen Kyle's hostilities, which in turn would benefit Rachel. However, there had been no opportunity for such a relationship to develop because the grandparents immediately resorted to court-ordered visitation both before and after the death of Rachel's mother, Kimberly, and up until the time of trial. Rachel's therapist opined that the parent-child relationship should have primacy over the grandparent-grandchild relationship, and that Kimberly's death does not mean Rachel needs greater contact with her maternal grandparents.

Furthermore, as a matter of law, Kimberly's death did not imbue the grandparents with their daughter's parental rights or diminish Kyle's parental rights. Nothing in the unfortunate circumstance of one biological parent's death affects the surviving parent's fundamental right to make parenting decisions concerning their child's contact with grandparents. (Cf. *Von Eiff v. Azicri* (Fla. 1998) 720 So.2d 510, 515 [statute similar to § 3102 was unconstitutional on its face because it violated the Florida Constitution's guarantee of privacy].)

Thus, Kyle, who was a fit parent and who agreed to allow visitation, had the fundamental right as a parent to prefer flexible unscheduled visitation

---

[5]Although the grandparents initially attempted to gain custody of Rachel based on allegations that Kyle was unfit, they dropped such allegations when they abandoned their action for custody.

that would not interfere too much with his quality parenting time with Rachel on the weekends, or with Rachel's extracurricular activities. The grandparents had the burden to show that this preference for nonscheduled visitation was not in Rachel's best interest. The only evidence they offered to support their belief that court-ordered visits were necessary was Kyle's hostility toward the grandparents. But his hostility was caused in part by their pursuit of court-ordered visits and their refusal to deviate from the schedule without receiving an exact quid pro quo even if their refusal was not in Rachel's best interest. The grandparents' argument was circular and insufficient to overcome the presumption in favor of Kyle's fundamental right to make parenting decisions regarding his child's visits with a nonparent. (See *Adoption of Berman* (1975) 44 Cal.App.3d 687, 696-697 [118 Cal.Rptr. 804].)

In light of the fact Kyle was a fit parent who had not sought to cut off grandparent visitation completely, and in light of the absence of substantial evidence rebutting the presumption in favor of a fit parent's parenting decisions, the application of section 3102 to establish a schedule of visitation over Kyle's objection unduly infringed upon his fundamental parenting right to make decisions about the care, custody, and control of his daughter. (*Troxel, supra,* 530 U.S. at pp. 71-72 [120 S.Ct. at pp. 2062-2063, 147 L.Ed.2d at p. 60].) In other words, section 3102 is unconstitutional as applied to this case. (*Troxel, supra,* 530 U.S. at pp. 71-72 [120 S.Ct. at pp. 2062-2063, 147 L.Ed.2d at p. 60]; see also *Brice v. Brice* (2000) 133 Md.App. 302 [754 A.2d 1132].)

Because the visitation order violated Kyle's parental rights guaranteed by the due process clause of the Fourteenth Amendment, the order must be reversed, and remand for further proceedings on the question of visitation is inappropriate. (*Troxel, supra,* 530 U.S. at pp. 74-75 [120 S.Ct. at p. 2065, 147 L.Ed.2d at p. 62] [where it is apparent that a visitation order violated the Constitution, "[w]e should say so now, without forcing the parties into additional litigation that would further burden . . . parental right[s]."].)

II*

. . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The judgment is reversed, and the matter is remanded to the trial court with directions (1) to vacate its order granting the grandparents' request for a visitation schedule with Rachel, and to enter a new order denying that request, and (2) to conduct further proceedings on the request for an award

---

*See footnote, *ante,* page 848.

for attorney fees expended in the trial court. The grandparents' request for attorney fees on appeal is denied. The grandparents shall pay Kyle's costs on appeal. (Cal. Rules of Court, rule 26(a).)

Sims, J., and Hull, J., concurred.