[No. E050935. Fourth Dist., Div. Two. Oct. 17, 2011.]

SHANNON FAYE HOAG, Plaintiff and Respondent, v.
MELVILLE E. DIEDJOMAHOR, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part I.A.

**COUNSEL**

Law Office of Ugo-Harris P. Ejike and Ugo-Harris P. Ejike for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

**OPINION**

**RICHLI, J.**—Like the landmark case of *Troxel v. Granville* (2000) 530 U.S. 57 [147 L.Ed.2d 49, 120 S.Ct. 2054] (*Troxel*), this case involves a grandparent, whose adult child has died, seeking visitation with that child's minor children over the objection of their surviving parent.

*Troxel* commands the courts to presume that the surviving parent's objection to grandparent visitation is in the best interest of the children. However, this does not mean that the surviving parent is free to use the denial of visitation as Big Bertha in his or her personal war with the grandparent. Here, the trial court found that the surviving parent's claimed reasons for objecting to visitation were not reasonable and not credible; in essence, as he practically admitted on the stand, he objected to visitation mainly to spite the grandparent. Moreover, he admitted that grandparent visitation would be in the best interest of the children. Thus, the presumption that he was acting in the best interest of his children was overcome, and the trial court constitutionally could and did grant the grandparent's visitation petition.

I

FACTUAL BACKGROUND

A. *The Scope of the Record.**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

B. *The Facts as Shown by the Record.*

Melville E. Diedjomahor (the father) and Kristen Hoag (the mother) were married in 2005. They lived with Kristen's mother, Shannon Faye Hoag (the

---

*See footnote, *ante*, page 1008

grandmother), at her apartment in La Habra. In 2006, their first daughter was born. Sometime in 2007, they separated. The father went to live in Desert Hot Springs; the grandmother, the mother, and the daughter all remained in La Habra. In April 2008, however, they reconciled. Thus, the mother and the daughter moved into the father's apartment in Desert Hot Springs; the grandmother moved in along with them. Later in 2008, the couple's second daughter was born.

In sum, then, the grandmother lived with both of the children from the time they were born. She helped to care for them. She testified that she was "like a third parent . . . ."

On February 25, 2009, the mother filed for divorce. According to the grandmother, the mother moved out and went to live with her oldest brother (the uncle), accompanied by the children and the grandmother. According to the father, however, the mother did not move out; she merely went to the uncle's house for a weekend visit.

On March 29, 2009, during this stay at the uncle's house, the mother died suddenly as a result of previously undiagnosed epilepsy. In the immediate aftermath of her death, the children remained with the grandmother, at the uncle's house. The father visited them every couple of days.

On May 3 or 4, 2009, the grandmother told the father that she was going to file a petition for guardianship of the children. He responded by demanding that she return the children to him. She testified that he also told her that "it was over for [her] as far as any contact was concerned . . . ."

On May 5, 2009, the grandmother did, in fact, file a guardianship petition. In it, she alleged that the father was "unable to care or provide for" the children because (1) "[h]e had an accident that left him temporarily disable[d] from the waist down" and (2) he was an undocumented alien subject to deportation. It was true that in February 2009 the father had been in an accident; as a result, he was confined to a wheelchair for about seven months. It was also true that he was in the United States illegally. However, he had entered the country legally, and he had applied for permanent residency. The mother thwarted his application by refusing to appear at a hearing. At the time of trial, he was still in the process of obtaining permanent residency.

Because the grandmother was alleging that the father was unfit, Child Protective Services was required to carry out an investigation, and it did. (See Prob. Code, § 1513, subd. (c).) However, it found "no concern."

According to the grandmother, the father never offered to let her have any visitation that was not court ordered. The father testified, however, that he would have been willing to let her visit without a court order.

For a week or so after the grandmother filed the guardianship petition, she was unable to visit the children. On May 14, 2009, the guardianship court ordered the parties to agree to a visitation schedule. The father refused to agree to dates the grandmother requested; he offered only dates on which she had to work. As a result, it was three weeks until a visit actually took place. In June 2009, the guardianship court imposed a visitation schedule.

In the course of the guardianship case, the father learned that the uncle had admitted "improperly touch[ing]" the mother when she was a minor. He also learned that, in 1993, the grandmother's children had been removed from her custody because she was using drugs (although the children had been returned to her, and she claimed that she had not used drugs since).

In December 2009 (i.e., after this case was filed, and after there was a temporary visitation order in effect in this case), the guardianship case was dismissed.

By the time of trial, the grandmother had moved out of the uncle's house and into an apartment in the same complex as the father. She had court-ordered visitation for three hours every Wednesday evening and 48 hours every other weekend. She was allowed to phone each child once a day. She wanted the trial court to adopt this as its final visitation schedule.

The father conceded that the children loved the grandmother. He also agreed that "she should be allowed to spend time with them . . . ." He testified that he would allow visitation voluntarily. However, he expressed some opposition to visitation, arising out of the grandmother's efforts to obtain custody. For example, he testified that he had "concerns" about visitation because there was "an issue of trust. She broke that trust by pushing me as a parent . . . claiming my children . . . ." He also testified that he objected to overnight visitation because "my mother-in-law has claimed to the court . . . that practically she raise[d] the children . . . . And as a father, [to] just sit back and watch and go, 'Okay, have it,' is not something I can do. Those statements ha[ve] consequences."

The father paid a friend to babysit the children when he was at work. He refused to let the grandmother act as their babysitter, because he no longer trusted her since she had tried to obtain custody of his children.

Regarding the visitation schedule, the father objected to the Wednesday evening visit because it prevented him from "study[ing]" with the children. He objected to any overnight visitation because he believed it would expose the children to the uncle. He also objected to daily phone calls because they interrupted whatever he and the children were doing and because he had to stay home to receive them.

The father wanted the trial court to deny visitation entirely. If it did order visitation, however, he wanted visitation limited to eight hours every other Saturday, plus one week during summer vacation (during the day only; i.e., no sleepovers), plus eight hours on the grandmother's birthday; he wanted phone calls limited to two per week.

## II

## PROCEDURAL BACKGROUND

In October 2009, the grandmother filed a petition for visitation. (See Fam. Code, § 3102.)

In January 2010, the case went to mediation. The mediator recommended visitation for three hours every Wednesday evening and 48 hours every other weekend, plus daily phone calls. The trial court adopted the mediator's recommendations as its temporary visitation order.

In March 2010, after a full trial, the trial court granted the visitation petition. At the father's request, it provided a statement of decision. It began by acknowledging that "[section] 3102 of the Family Code . . . is unconstitutional when applied to a surviving parent who is neither unfit nor opposed to occasional visitation." It found "overwhelming" evidence that the father was a fit parent. However, it further found that he was opposed to any reasonable visitation by the grandmother: "[F]ather's offers of reasonable visitation are feigned at best and without any substance." "His claim regarding an offer of reasonable visitation is not credible. This court does not believe him. His evidence presented, his demeanor, as well as his answers betrayed his position." Similarly, it found that his purported concerns about the "past history of drug abuse, child neglect, and family sexual abuse" were unreasonable and not credible. Finally, it found that "it is in the children's best interests to have visitation with their grandmother."

The trial court ordered the same visitation schedule as the temporary visitation order, with minor changes, including reducing telephone visitation to twice a week.

## III

## DISCUSSION

A. *General Legal Principles.*

In *Troxel*, the trial court allowed two grandparents—the parents of a deceased parent—to have more visitation with their grandchildren than the

surviving parent was willing to allow. (*Troxel, supra*, 530 U.S. at pp. 60–61 (plur. opn.).) It relied on a state law that authorized it to grant any person visitation, as long as such visitation was in the best interest of the child. (*Id.* at pp. 61, 67.)

█ The plurality opinion, by Justice O'Connor, began by noting that parents have a "fundamental right . . . to make decisions concerning the care, custody, and control of their children." (*Troxel, supra*, 530 U.S. at p. 66 (plur. opn.).) It concluded that the statute "as applied . . . in this case, unconstitutionally infringes on that fundamental parental right" (*id.* at p. 67), based on "the combination of several factors . . . ." (*Id.* at p. 68.) First, the surviving parent was a fit parent. (*Id.* at pp. 68–69.) "[T]here is a presumption that fit parents act in the best interests of their children." (*Id.* at p. 68.) Second, the trial court (and the state statute) failed to give "special weight" to the surviving parent's determination of the child's best interests. (*Id.* at pp. 69–70; see also *id.* at p. 67.) Third, the surviving parent had never tried to cut off visitation entirely; the trial court, however, "fail[ed] to accord significant weight" to the fact that she had offered the grandparents "meaningful visitation." (*Id.* at pp. 71–72.) "Significantly," the plurality noted, "many other States expressly provide by statute that courts may not award visitation unless a parent has denied (or unreasonably denied) visitation to the concerned third party." (*Id.* at p. 71.)

The plurality noted that the trial court had based its visitation order on two findings—that the grandparents could " 'provide opportunities for the children in the areas of cousins and music' " and that " '[t]he children would be benefitted from spending quality time' " with the grandparents. (*Troxel, supra*, 530 U.S. at p. 72 (plur. opn.).) It concluded that "this case involves nothing more than a simple disagreement between the [trial court] and [the surviving parent] concerning her children's best interests." (*Ibid.*) It declared, "[T]he Due Process Clause does not permit a State to infringe on the fundamental right of parents to make childrearing decisions simply because a state judge believes a 'better' decision could be made." (*Id.* at pp. 72–73.)

Justice Souter concurred in the judgment. (*Troxel, supra*, 530 U.S. at pp. 75–79 (conc. opn. of Souter, J.).) He would have held the statute unconstitutional on its face. (*Id.* at pp. 76–77.) Justice Thomas also concurred in the judgment. (*Id.* at p. 80 (conc. opn. of Thomas, J.).) In his view, under the strict scrutiny test, "the State of Washington lacks even a legitimate governmental interest—to say nothing of a compelling one—in second-guessing a fit parent's decision regarding visitation with third parties." (*Ibid.*)

In California, Family Code section 3102, subdivision (a) (section 3102), as relevant here, provides: "If either parent of an unemancipated minor child is

deceased, the . . . grandparents of the deceased parent may be granted reasonable visitation with the child during the child's minority upon a finding that the visitation would be in the best interest of the minor child."

Under *Troxel*, however, section 3102 has been held unconstitutional as applied in particular factual circumstances. For example, in *Zasueta v. Zasueta* (2002) 102 Cal.App.4th 1242 [126 Cal.Rptr.2d 245], the court held the trial court erred by "dismiss[ing]" the surviving parent's concerns about visitation—which related to the grandparents' drinking, swearing, and uncleanliness, as well as the child's "uneasiness" and acting out after visits—instead of according them special weight. (*Id.* at p. 1253.)

Similarly, *Punsly v. Ho* (2001) 87 Cal.App.4th 1099 [105 Cal.Rptr.2d 139], disapproved on other grounds in *Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1226, footnote 4 [117 Cal.Rptr.3d 342, 241 P.3d 840], held that the trial court erred because it did not apply a presumption that the surviving parent's visitation decisions were in the child's best interest. (*Punsly*, at p. 1109.) Moreover, the trial court erred by "dismiss[ing]" her concerns about visitation, including the fact that the grandparents used "inappropriate language." (*Id.* at pp. 1109–1110.)

■ Also in *Punsly*, the grandparents argued that *Troxel* did not apply because the surviving parent had cut off visitation entirely (*Punsly v. Ho, supra*, 87 Cal.App.4th at p. 1108); only after the grandparents obtained counsel did she offer them a visitation schedule, which they viewed as too restrictive. (*Ibid.*; see also *id.* at p. 1102.) The court disagreed, stating, "We construe *Troxel*'s emphasis on a parent's voluntary efforts for visitation to mean that before a court may intervene, the parent must be given an opportunity to voluntarily negotiate a visitation plan. [Citation.] Consequently, it is irrelevant when or why [the surviving parent] proposed her own visitation schedule. The important consideration here is that she did." (*Id.* at p. 1108.)

In *Kyle O. v. Donald R.* (2000) 85 Cal.App.4th 848 [102 Cal.Rptr.2d 476], the court noted that the surviving parent was fit, and he was willing to allow grandparent visitation; he simply did not want a court-imposed visitation schedule, so that visits would be spontaneous and would not interfere with the child's routine. (*Id.* at pp. 863–864.) It concluded, "In light of the fact [the surviving parent] was a fit parent who had not sought to cut off grandparent visitation completely, and in light of the absence of substantial evidence rebutting the presumption in favor of a fit parent's parenting decisions, the application of section 3102 to establish a schedule of visitation over [the surviving parent]'s objection unduly infringed upon his fundamental parenting right to make decisions about the care, custody, and control of his daughter. [Citation.]" (*Id.* at p. 864.)

■ Significantly, however, in *Fenn v. Sherriff* (2003) 109 Cal.App.4th 1466 [1 Cal.Rptr.3d 185], the court specifically held that section 3102 is not unconstitutional on its face or under all circumstances. (*Fenn*, at p. 1478.) "Giving the parent's determination 'special weight' is different than insulating the parent's determination from any court intervention whatsoever. *Troxel* does not support defendant's suggestion that a fit parent's decisions are immune from judicial review." (*Id.* at p. 1479.)

In *Fenn*, the surviving parent sought summary judgment denying visitation by the grandparents, on the sole ground that he was fit and he objected to visitation. (*Fenn v. Sherriff, supra,* 109 Cal.App.4th at p. 1470; see also *id.* at p. 1482.) In opposition, the grandparents introduced evidence that he had allowed them only extremely restricted visitation—among other things, the visitation averaged one hour every two and a half months, it had to be supervised by a person selected by the father, and the grandparents were required to "pay various sums connected with the supervised visits amounting to 'approximately $5.78 per minute for a one hour visit' . . . ." (*Id.* at p. 1479.)

The appellate court held that the father was not entitled to summary judgment, "even if we were to take into account the fact that he and his wife have voluntarily provided some visitation to grandparents. [Citation.] It is true that in their analysis of the federal constitutional question presented here, *Troxel*[*, Punsly,* and *Kyle O.*] placed significant emphasis on the fact that the fit parents who opposed court-ordered visitation in those cases had voluntarily allowed some grandparent visitation. [Citations.] It does not follow, however, that the decision of a fit parent to allow some amount of grandparent visitation, however small and under whatever circumstances, necessarily renders imposition of any court-ordered visitation unconstitutional as a matter of law regardless of any other attendant facts or circumstances." (*Fenn v. Sherriff, supra,* 109 Cal.App.4th at pp. 1482–1483.)

"[I]n the words of the *Troxel* plurality, an offer of 'meaningful visitation' to the grandparents is entitled to 'significant weight' in determining whether intervention by the court would be constitutional. [Citation.]" (*Fenn v. Sherriff, supra,* 109 Cal.App.4th at p. 1484.) "[I]t is far from obvious that father has offered [the grandparents] 'meaningful' visitation . . . ." (*Ibid.*) The court concluded that, on the record before it, "court-ordered visitation would not necessarily be unconstitutional . . . ." (*Id.* at p. 1485.)

We may summarize all of these cases as follows: "A custodial parent's decisions regarding visitation are entitled to presumptive validity and must be accorded 'special weight,' but they are not immune from judicial review. [Citation.]" (*Guardianship of L.V.* (2006) 136 Cal.App.4th 481, 493 [38 Cal.Rptr.3d 894].)

B. *Ordering Visitation over the Father's Objections.*

The trial court understood the law to be that it could constitutionally apply section 3102, including its best-interest test, provided the father was either (1) unfit or (2) "opposed to occasional visitation." It expressly found that he was a fit parent. It concluded that "the issue really turns on whether dad is opposed to occasional visitation. If he is, then the court then addresses what visitation, if any, is in the children's best interest." It found that the father was "opposed [to] any . . . reasonable visitation involving the children and grandma." Thus, it proceeded to apply a standard best-interest test.

The father challenges this reasoning on two grounds. First, he argues that the trial court erred by finding that he was opposed to meaningful visitation. Second, he argues that, even assuming that he *was* opposed to meaningful visitation, he was still entitled to a presumption that his decision was in the best interest of the children.

In *Troxel*, the surviving parent's willingness to allow visitation was just one of a number of factors that the Supreme Court took into account. Thus, the significance of this single factor, standing alone, is not at all clear. We have no way of knowing what the outcome would have been if the surviving parent had *not* been willing to offer meaningful visitation.

On one hand, the *Troxel* plurality cited, with approval, various state statutes allowing courts to award visitation to a nonparent when a parent has denied visitation; it evidently viewed these as constitutional. (*Troxel, supra*, 530 U.S. at pp. 71–72 (plur. opn.).) On the other hand, it adopted a broad "presumption that fit parents act in the best interests of their children." (*Id.* at p. 68.) It would seem that this should apply not only to a decision to limit visitation, but also to a decision to deny visitation entirely.

In fact, *Troxel*'s discussion of willingness to allow visitation puts the parent in a "damned if you do, damned if you don't" position. If the parent voluntarily allows some visitation, that could be viewed as a concession that visitation is in the best interest of the child. Certainly it is a decision regarding the child's best interest, to which the court must accord "special weight." If, however, the parent refuses to allow *any* visitation voluntarily, that, too, weighs in *favor* of court-ordered visitation. What is a parent who genuinely believes that visitation would be detrimental supposed to do?[1]

Because this issue is fraught with difficulty, we choose to assume—solely for the sake of argument—that the trial court erred by ruling that it was free

---

[1] Even more problematic is the implication in *Troxel* that it might be constitutional to override a parent's visitation determination if the parent has "*unreasonably* denied" visitation. (*Troxel, supra*, 530 U.S. at p. 71 (plur. opn.), italics added.) How is a trial court to determine

to apply a best-interest test *solely* because the father was not willing to offer meaningful visitation voluntarily. This would mean that it was still required to presume that the father's visitation determination was in the best interest of the children and to accord special weight to that determination.

■ The trial court's other findings, however, show that, even if it had applied this standard, it would still have allowed visitation. Most crucially, it found that the father's claimed reasons for objecting to visitation were not reasonable and not credible. This left, as his *real* reason, a desire to retaliate against the grandmother for her attempt to take the children away from him. Indeed, he testified that he was contesting visitation because she had breached his trust by trying to take the children away from him, and she had been "disrespectful" to him. We hasten to add that this is a completely understandable reaction. Nevertheless, it is not based on the best interest of the children. To the contrary, it punishes the children for the sins of the grandmother.

Moreover, in closing argument, the father's counsel *conceded* that visitation with the grandmother would be in the best interest of the children. He merely argued that *court-ordered* visitation would be detrimental. Thus, the trial court did not simply disagree with the father concerning the best interest of his children. Moreover, it did not fail to give sufficient weight to his determination of their best interest. Rather, based on its findings (and his concession), the presumption that his visitation determinations were in the best interest of the children was thoroughly overcome.

Evidently the father's counsel was trying to achieve the same outcome as in *Kyle O.* The father there, too, admitted that visitation with the grandparents was in his daughter's best interest and claimed that he would allow visitation voluntarily. He testified, however, that *court-ordered* visitation was detrimental because it increased the hostility between him and the grandparents. (*Kyle O. v. Donald R., supra*, 85 Cal.App.4th at pp. 858–859, 863–864.) He also introduced evidence that court-ordered visitation had interfered with the child's opportunities to spend time with him and her paternal relatives and that it conflicted with her other activities. (*Id.* at pp. 857–858.) The appellate court concluded that "his preference for a less structured and more normal and spontaneous manner of visitation must be given deference." (*Id.* at p. 863.)

*Kyle O.* is distinguishable, however, because here, the father (and his counsel) never really explained *why* he objected to court-ordered visitation, even though he was supposedly willing to allow visitation voluntarily. When

---

whether the parent's denial of visitation is unreasonable, except by asking whether allowing visitation is "a 'better' decision" that would be in the child's best interest? Yet this is exactly what it is not supposed to do.

asked, he simply raised objections to the existing temporary visitation *schedule*. For example, he claimed that the Wednesday evening visit prevented him from "study[ing]" with the children.[2] This was not an objection to *court-ordered* visitation.

In this appeal, the father claims that it was reasonable for him to be opposed to court-ordered visitation, as opposed to voluntary visitation, because the grandmother had "a pattern of hostility" toward him. He argues that, unlike voluntary visitation, court-ordered visitation would give her a stick to beat him with—any time he violated an order, she would undoubtedly seek sanctions against him.[3] The problem with this argument is that the father himself never *testified*, at trial, that this was *why* he opposed court-ordered visitation. Thus, the trial court did not have to accept this theory.

The father also argues that the trial court erred by dismissing his concerns about whether the children would be safe with the grandmother. The trial court, however, specifically found that these concerns were neither reasonable nor credible. Substantial evidence supports this finding. The supposed molestation was remote; it had occurred when the uncle was about 12 and mother was about five. It was described as "improper[] touch[ing]"; the grandmother characterized it as "playing doctor." The children had stayed at the uncle's house for over a month without being molested. In any event, by the time of trial, the grandmother was no longer living with the uncle. The trial court could and did order that the children not be left alone with him.

The grandmother's drug use was similarly remote. Her loss of custody, although due, in part, to her use of drugs, had been only temporary. It did not appear that she had ever used drugs again. Last, but not least, again, the father admitted that visitation was in the best interest of the children and claimed that he was willing to allow visitation voluntarily.

Next, the father argues that the trial court erroneously placed the burden on him to prove that his objections to visitation were in the best interest of the children. Not so. He does not cite any portion of the record to support his claim, and we have found none.

Finally, the father argues that even if the trial court did not err by allowing some visitation, it erred by adopting a more extensive visitation schedule than

---

[2] At the time, the children were one year old and three years old, respectively. This is a good example of why the trial court found that the father's claimed objections to visitation were not credible.

[3] To show a pattern of hostility, he notes that she filed the guardianship proceeding and this visitation proceeding. He also notes that she refused to give him the children's vital records without a court order. Other things that he claims she did, however, such as making "numerous police calls" and "calling his employers," are not supported by any evidence in the record.

he was willing to offer. He does not support this argument, however, with any analysis or citation of authority. Accordingly, we deem it forfeited. (See *Sullivan v. Centinela Valley Union High School Dist.* (2011) 194 Cal.App.4th 69, 72, fn. 3 [122 Cal.Rptr.3d 871].)

We do not mean to suggest that, if not forfeited, it would have merit. The trial court found that the father's objections to visitation did not arise out of a genuine concern for the best interest of the children. Thus, the constitutionally established presumption that he was acting in the best interest of the children was overcome. This not only allowed but affirmatively required the trial court to determine what visitation schedule was in the best interest of the children.[4]

## C. *The Need for a Prior Request for Voluntary Visitation.*

The father argues that, under *Punsly*, the trial court could not order visitation unless and until he had been given an opportunity to negotiate visitation voluntarily.[5] He had such an opportunity, however, in the course of the guardianship, as well as in this action. He even participated in mediation (which regrettably produced no agreement).

According to the father, however, a grandparent must ask the surviving parent for a voluntary visitation arrangement before the grandparent can even file a visitation petition with the court. Thus, in his view, the fact that he had an opportunity to negotiate a voluntary visitation arrangement after this proceeding had already been filed is irrelevant. We find no authority for this in *Troxel* or *Punsly*. Indeed, *Punsly* is, if anything, to the contrary. It understood *Troxel* to mean that "the parent must be given an opportunity to voluntarily negotiate a visitation plan," but it added that it was "irrelevant" when or why the parent did so. (*Punsly v. Ho, supra*, 87 Cal.App.4th at p. 1108.) Moreover, it held that, in the case before it, this requirement had been satisfied by the parent's agreement "to voluntarily arrange visitation . . . *both before and after the* [*grandparents*] *petitioned the court for visitation.*" (*Ibid.*, italics added.)

The father argues that it would be good public policy to make a request for voluntary visitation a precondition to filing a visitation petition. Even if so, this is an argument that must be made, if at all, to the Legislature. Section 3102 contains no such requirement, and the federal Constitution, as construed in *Troxel*, does not impose one.

---

[4] Nothing we say in this opinion should be construed as precluding the father from asking the trial court to modify the visitation schedule based on changed circumstances.

[5] In addition to *Punsly*, he also cites *Kyle O. v. Donald R., supra*, 85 Cal.App.4th at page 863. We find nothing in *Kyle O.*, however, that speaks to this issue.

## IV

## DISPOSITION

The judgment is affirmed. The grandmother has not appeared, so presumably she has no costs on appeal. Nevertheless, if only out of an excess of caution, we order in the interest of justice that each side shall bear its own costs.

Ramirez, P. J., and Miller, J., concurred.

On November 15, 2011, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied January 25, 2012, S198268.