[No. D060197. Fourth Dist., Div. One. Jan. 29, 2013.]

IAN J.[1] et al., Plaintiffs and Respondents, v.
PETER M., Defendant and Appellant.

---

[1] In order to protect the identities of the minors who are the subject of this proceeding, we have substituted pseudonyms for their names and the names of their parents, grandparents, aunt and uncle.

## COUNSEL

Eisenberg and Hancock, William N. Hancock, Jon B. Eisenberg; Law Office of Albert C. Gross and Albert C. Gross for Defendant and Appellant.

Sullivan, Hill, Lewin, Rez & Engel, Candace M. Carroll and Jenny K. Goodman for Plaintiffs and Respondents.

## OPINION

**BENKE, J.**—In this contentious dispute over grandparent visitation, the family court entered an order which improperly invades appellant's constitutionally protected right to determine who and under what circumstances individuals may have contact with his daughters, who are now 13 and nine years old.

As we read the cases which have discussed a parent's constitutional right to limit grandparent visitation, appellant was not required to prove his former father-in-law was guilty of misconduct or was more likely than not to harm appellant's daughters. Rather, because a parent is ultimately responsible for the well-being of a child, and a fit parent is presumed to make decisions in his or her child's best interest, the grandparents in this case were required to show clear and convincing evidence that, notwithstanding appellant's objection, extended unsupervised visitation with them was in the children's best interest. The grandparents failed to meet that burden and the family court therefore erred in ordering visitation under Family Code[2] section 3102.

---

[2] All further statutory references are to the Family Code unless otherwise indicated.

As we explain, the record contains a number of diary entries made by the girls' deceased mother in which she accuses her father, the girls' maternal grandfather, of raping her when she was a child and of other inappropriate behavior. The diary entries were made while the mother was being treated for an eating disorder and an emotional illness. In other diary entries the mother recanted the accusations. The record also provides uncontroverted evidence the two young girls who are the subject of this appeal are very uncomfortable in the presence of their maternal grandfather, have made specific complaints about what they believe is inappropriate behavior on his part, and at this point are adamantly opposed to visiting him.

The record also contains the assessment of a court-appointed psychosexual evaluator. The evaluator stated that upon initially reviewing the mother's diary he found the accusations therein credible. The evaluator also performed a test, which places the grandfather in a borderline range between men who are pedophiles and men with normal sexual desires. Although suggested by an expert retained by appellant, the court-appointed evaluator did not perform any phallometry, which measures penile response to various stimuli. Notwithstanding the credibility the evaluator initially found in the diary accusations and the ambiguous psychosexual test results, based on interviews with other members of the family and the grandfather, the evaluator concluded the grandfather did not pose a substantial risk to his granddaughters.

Given this record, appellant's concerns about permitting the grandfather to have unsupervised visits with his daughters are legitimate. The girls' discomfort in the presence of their grandfather alone supports a parent's vigorous intervention on their behalf. Thus, the family court's order, which requires extended unsupervised visitation with the maternal grandfather, must be reversed.

As we explain, because of conflict between appellant and his former in-laws, because of the lengthy litigation which has already taken place, and because of the opposition of the girls to visit their grandfather, no further proceedings on remand are appropriate.[3]

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *Linda*

#### a. *Diary Entries*

Linda M. (Linda) was born in South Africa in 1968. Her parents, Ian J. (Ian) and Jane J. (Jane), are respondents herein, as is her sister Ann T. (Ann).

---

[3] We deny the application of ACLU Foundation of San Diego & Imperial Counties to file an amicus curiae brief.

Ian and Jane have a third child, Richard. Ian was a very successful invest-ment fund manager in South Africa and the family experienced a fairly luxurious standard of living, including a great deal of domestic support.

In 1989 Ian moved the family to the United States where he continued his successful career. The family initially settled in New York; however, they did not enjoy quite as high a standard of living there and, according to Ian, Linda experienced a great deal of difficulty in making the transition to life in this country.

From March 1993 until September 1995, Linda was treated on an outpa-tient basis for an eating disorder and a borderline personality disorder. In an initial evaluation and discharge summary at the clinic where Linda was treated she complained of "a significant history of sexual abuse." The summary notes a "history of incest with father, ages 6–14/15." A therapist note also indicated Linda was attending "an incest survivor's group" along with her individual and group treatment at the clinic.

While receiving treatment for her eating disorder, Linda made a number of diary and journal entries which, after her death, came to light. In her journals and writings during the years she was in treatment Linda stated:

"04/02/93 When I told her [(Jane)] about my father she said: He was probably drunk; and he didn't mean it. It's the only way he can show you that he loves you."

"04/09/93 I am part of this group and an incest group."

"04/10/93 I'm starting an incest group on 4/20. Until January I thought all fathers raped their daughters and all mothers hated them for it."

"04/15/93 The only people I have told about 'the issue' are therapists. I mean, what is the big deal—he raped me. It's just hands and penis and body. The definition of a bitch is anyone with a vagina and an attitude. How could I tell him to stop? No one cared. They saw—but I was told (whenever I did cry) to stop disturbing everything; to stop making a scene and causing trouble. I was the difficult child: the one most likely to say and do the wrong thing. You want to know what the correlation between sexual abuse and bulimia is . . . we're trying to rid ourselves of everything inside."

"04/30/93 I think I made it all up. I'm a liar, and so filthy. Where did all my fear come from? I must be psychotic. I'm an attention seeker so desperate for attention that I go around telling wicked lies about my parents."

"05/02/93 I'm such a loser. I'm so disgusting. I can't relate to people. I hurt them. I'm dishonest. I lie ALL THE TIME. I can't tell what is real any more."

"05/02/93 Why have I made up all these lies? Why am I hurting my parents, my sister, my friends. Myself?"

"05/03/93 I think I'm going to stop my incest group. Want to get on with my life. Do you think that's wise? I can't distinguish between avoidance and protecting myself. How do you tell? Do you think it's possible I made the whole thing up to justify my pain?"

"05/08/93 There is so much buried—what happened to me when I was littler. What did the people everyone loves and respects do to me—all in the name of love. I think I'm getting to a point of being able to confront my father. I told my mother about the incest group on Thursday."

In an undated letter to Jane, Linda wrote: "When I was 7 my father raped me," but provided no further information.

###### b.   *San Diego*

In 1995 Linda moved to San Diego. Shortly after moving to California, in an essay she wrote for admission to graduate school in psychology, Linda wrote: "When I was a little girl, my father would come into my room at night and kiss me all over my face, at times sticking his tongue in to my mouth, always pulling closer and laughing as I fought him, tried to hide, to pull away . . . . My mother is a perfect match for my father. He is overly close, controlling, and megalomaniacal. She is distant, passive, and icy-cold. With my father, I was able to separate myself from my body. . . . When I begged my mother, at twelve years old, to ask my father to stop kissing me, I believed her when she said that I was crazy and hysterical. When I told her again just three years ago, I did not believe her when she said: 'That's the South African way, Linda, every man did that,' and 'Oh, he was probably drunk.' "

Linda's sister, Ann, confirmed some aspects of Linda's accusations about Ian's behavior but questioned the reality of Linda's more serious complaints. Ann confirmed that Ian kissed her on the lips just as, according to Linda, he had kissed Linda; Ann told Ian to stop kissing her on her lips when she was in her 20's. According to Ann, Linda also wrote a novel, which included a character who had been molested by her father. The book caused an argument between Linda and Ann. Ann believed it was a break from reality.

In declarations submitted in support of her request for visitation for herself and her parents, Ann stated in fairly categorical terms that Linda had never told her about being molested. However, in her interview with the court's psychosexual evaluator, when confronted with the fact Linda had told others about being molested, Ann responded by making the following statement: "She was attention-seeking. It was never enough for her, she was never good enough. She would get really depressed sometimes. She battled a lot of stuff. She would tell random people different stories. I knew she would say things. (Did she ever tell you she was molested?) She would tell me, but the stories would change, and then later she would deny it. Her reality would shift so much, I wondered about my own. (What did she say to you?) She said our father would kiss her, rub her legs while she was sleeping. He did this to me, too. I would tell her to tell him to stop, but she never wanted to do anything. (Anything else?) There were never any specifics. We would have fights about her inconsistencies. (Like what?) The first time was around the time Linda wrote her book. She asked me to edit it. She seemed to have breaks from reality. She'd make stuff up."

Linda also shared her novel with her uncle's wife. The uncle's wife asked Linda "if she was trying to tell [her] something and her answer was yes, but to please keep it to [herself]."

### c. *Marriage*

After Linda moved to San Diego she met appellant Peter M. (Peter). Linda and Peter were married in 1997. According to Peter, although he was aware of conflict between Linda and her father, Linda never told him she had been molested.

When Linda became pregnant with her first child she asked Ian and Jane to move to San Diego so that Jane could help care for the baby. Ian and Jane agreed and moved to a home near Linda and Peter.

Linda gave birth to her first daughter, Susan, in 1999. From the time of Susan's birth, Jane was the principal daytime caregiver because Linda and Peter were both working establishing a posture therapy business. Both Ian and Ann assisted in taking care of Susan.

Although Linda, Peter, and Susan spent a good deal of time with Linda's parents and Ann after Susan was born, the record nonetheless reflects that Linda had not resolved all of her feelings toward her father. On January 25, 2002, shortly before Susan's third birthday, Linda wrote in a diary: "It was not mentioned that it was not OK to walk naked into your daughter's room and pin her hands together while you kissed her. It was not mentioned that it was not OK to walk into her room and stare at her while she was dressing."

In 2003 Linda gave birth to a second daughter, Nancy. Jane took care of both Susan and Nancy while Linda and Peter worked in their business.

Following Nancy's birth Linda experienced further emotional difficulty and was treated by a psychologist, Dan Galant, Ph.D. Galant later reported that in group therapy sessions Linda attended in 2004 and 2005, Linda "disclosed that some of her present emotional problems were related to having been incestuously molested by her father during her childhood." Galant found Linda's accusations credible but did not file a child abuse report while Linda was in treatment with him.

Linda also disclosed her molestation claims to Bob Short, who described himself as a facilitator and coach. Short stated: "Linda conveyed to me in private sessions that her father on numerous occasions had sexually molested her in their home in South Africa where she grew up. She said also that her sister Ann was a victim of similar acts but not to the degree she had experienced. Linda said that she had told her mother about what her father had done, but she wrote it off by explaining to Linda that her father was intoxicated and wasn't aware of what he was doing."

### d. *Financial Dispute*

In late 2004 a dispute arose between Linda and Peter, on the one hand, and Ian and Jane, on the other hand. Linda and Peter asked Ian and Jane to lend them $500,000 to finance their business. According to a declaration later submitted by Jane, this request was based in part on the fact that in 2000 Ian and Jane lent their son, Richard, $500,000 over Linda's objections. When Ian and Jane refused Linda's request for financial assistance, Linda cut off all contact between her parents and her children. In January 2005, Linda sent her father the following e-mail: "Either I get my money by Jan 31, 05 WITH NO STRINGS ATTACHED or you don't get my kids."

Ian and Jane eventually gave Linda and Peter $128,000 and contact between Ian and Jane and their grandchildren resumed. Thereafter, Linda and her parents engaged in family counseling in an effort to mend the rift that Linda and Peter's demands had created. In the course of that reconciliation Jane sent Linda a letter in which she apologized for failing to acknowledge Linda's feelings about the loan to Richard.

### e. *South Africa*

In 2005 Linda experienced a great deal of emotional turmoil. She told Ian she was unhappy in her marriage and had obtained referrals to divorce attorneys. According to Ian and Jane, during this period Linda was addicted

to alcohol and Vicodin. In October 2005 Linda overdosed and was admitted to a local hospital. The physician who treated her noted that she reported "severe marital, financial, emotional pressures . . . throughout, worsening last few months."

Although Linda's parents were attempting to find a rehabilitation facility for her, Linda decided instead to take a trip to South Africa. Linda told her parents she was going back to South Africa to be alone and decide her future. When Linda arrived in South Africa she sent her father a very warm and affectionate e-mail in which, among other things, she expressed her hope he would be "around for a very, very long time . . . ."

Unfortunately, on November 10, 2005, while on a safari, Linda was trampled to death by an elephant.

### 2. *Trust Litigation*

Immediately following Linda's death, Peter, Susan and Nancy moved into Ian and Jane's home so that Jane could more easily help Peter care for the children while Peter continued to run the business. Peter and the girls stayed with Ian and Jane for approximately three weeks.

Prior to Linda's death, she and Peter had purchased $1 million life insurance policies on each other from the Metropolitan Life Insurance Company (MetLife). Linda designated a family trust and Susan as the beneficiaries of her policy. Peter was the trustee and principal beneficiary of the family trust. The policy was purchased before Nancy was born and Linda made any unborn children contingent beneficiaries of the policy.

Before she left for South Africa, Linda failed to make payments due on the MetLife policies, the policies lapsed and she then attempted to reinstate them. Unbeknownst to Linda, her efforts to reinstate the policies were unsuccessful and when, after Linda's death Peter attempted to make a claim for the policy benefits, MetLife initially took the position the policy had expired.

Because of Ian's business experience, Peter asked Ian for his assistance in recovering all or part of the benefits payable on Linda's MetLife policy. By way of a written letter agreement signed in May 2006, Ian agreed to advance the funds necessary to prosecute a claim on the MetLife policy, as well as legal action against the South Africans Ian and Peter believed were responsible for Linda's death. Ian also agreed to pursue negotiations with an executive of MetLife with whom he had a long-standing relationship. In return for Ian's assistance, Peter agreed that any proceeds recovered on the policy, or in any legal action against the South Africans, would be held in trust for Susan and Nancy.

As a result of his negotiation with MetLife, in September 2006 Ian was able to obtain MetLife's agreement to pay the entire $1 million in benefits payable on Linda's policy. Ian did so without resort to litigation or the assistance of any attorneys. However, Ian did not inform Peter about his success. Rather, in February 2007 Peter contacted MetLife on his own and discovered that the full policy benefits would be paid. Ian's failure to keep Peter informed may have grown out of Peter's unwillingness to sign trust documents Ian had prepared and presented to Peter in August 2006.

In July 2007 Peter initiated a probate petition in which he sought an order directing that one-half of the proceeds of the MetLife policy be paid to the family trust, which he controlled and of which he was the beneficiary. Ian objected to the petition on the grounds all the proceeds should be distributed under the terms of his May 2006 agreement with Peter. Jane filed a separate petition in which she asked that all the proceeds of Linda's insurance policy be distributed to a trust for the benefit of Susan and Nancy. The trial court found the May 2006 agreement was valid and enforceable and granted Jane's petition. We affirmed the probate court's order.

3. *Section 3102 Petition*

   a. *Termination of Contact*

In the months following Linda's death, Peter reconnected with a friend, Tricia. Tricia helped Peter take care of Susan and Nancy and in August 2006, they began dating. In January 2007 Peter married Tricia and she eventually adopted the girls.

In May 2007, at the time Peter and Ian were engaged in their intense dispute with respect to the proceeds of the MetLife policy, Nancy began acting out in a sexualized manner. Susan reported to Tricia that while they were taking a bath at their grandparents' home, Nancy got on top of Susan and started wriggling her hips in apparent simulation of a sex act. Susan reported Nancy stuck her tongue into Tricia's niece's mouth while kissing her; Tricia reported that Nancy did the same to her. Susan also reported that Nancy had taken Susan's hand and put it on her privates while the girls were getting ready for school.

Jane in fact later confirmed some aspects of these reports in a declaration, but interpreted the girls' behavior more benignly. According to Jane: "[S]imilar behavior mentioned by Peter occurred in February/March 2006 (witnessed by my sister and her children) and in June 2006 (witnessed by my brother . . . and his wife . . . , while they were taking care of the children when we were in South Africa dealing with matters relating to Linda's death.) Contrary to

Peter's claims, Susan and Nancy's words and actions in the spring of 2007 were not something new that he 'discovered.' In the previous instances, it was Susan who initiated the 'behavior.' Approximately two times with me and one time with my sister-in-law . . . , the girls locked the door to their bedroom and were giggling inside. When we got them to open the door, they said they had been kissing 'inside the lips.' My main concern about those incidents was that the door was locked, which I felt was a safety issue. I told them they were not allowed to lock any doors because one of them could get hurt and I would not be able to get inside. I further explained to them that kissing inside the lips was what married people who loved each other did and was not something that was appropriate for them to do. I actually did not know of the June 2006 occurrence until I mentioned Peter's claims to my sister-in-law . . . she then told me it had occurred with her too. Not surprisingly she dealt with it in the same way that I had. Both of us thought it was natural experimentation and curiosity and were not overly alarmed by the girls' actions."

According to Peter and Tricia, one day in May 2007 when they picked Nancy up following a visit with Jane and Ian, Nancy, who was four at the time, said: "I'm scared of Poppy [(Ian)], because he hugs and kisses me too much, too much, too much."

In response to these incidents Peter contacted Dr. Suzanne Marcus, a therapist who had treated Linda before her death. Dr. Marcus was reluctant to disclose what had been discussed in therapy, however, she told Peter: "I would be very careful with your children with [their] grandparents, with the grandfather, specifically."

According to Peter he then went to a "black bag" Linda had left. The black bag contained the diary Linda had written when she was being treated for bulimia in the 1990's, her graduate school application and other written material she had prepared. Peter testified that at that point he learned for the first time Linda had accused her father of rape.

Peter then contacted Galant, who, as we previously noted, had treated Linda prior to her death. Galant shared with Peter the molestation disclosures Linda had made in group therapy sessions. Peter disclosed to Galant that Nancy had complained that Ian held her too tightly. In light of that information Galant felt he was obligated to report what he knew to the San Diego County child protective services agency (CPS) and he, as well as Peter, did so.

Shortly after speaking with Galant, Peter told Jane and Ian that he would no longer permit them to have contact with the girls.

### b. *Petition*

In response to Peter's decision to terminate contact between his daughters and their grandparents, Jane, Ian and Ann filed their petition under section 3102 seeking visitation with Susan and Nancy. Shortly after the petition was filed, CPS concluded its investigation. According to the CPS report the allegations against Ian were "unfounded for sexual abuse but substantiated for substantial risk."

In June 2007 Peter, Tricia and the two girls moved to another part of California. Peter's family resides there and Peter frankly conceded that he wanted to get away from Ian, who he believes is "evil."

In September 2007, the family court, acting on a recommendation of a family court services mediator, ordered that Jane and Ann be permitted to have monthly unsupervised visits with Susan and Nancy. The order provided that the visits would be in San Diego in alternate months and that Ian would not be in the county when those visits occurred.

The family court further ordered that Ian submit to a psychosexual evaluation and that counsel meet and confer with respect to appointment of an evaluator.

In July 2008 Dr. Alan Liberman was appointed by the family court. Liberman commenced his evaluation by interviewing Ian in September 2008 and conducting a battery of tests. Liberman thereafter advised the parties that he would be asking Dr. Wesley Maram to conduct an evaluation of Ian. Maram in turned advised the parties that his evaluation would include "psychophysiological measures of phallometry assessing sexual interest and arousal pattern."

Liberman and Maram were not able to complete their evaluations of Ian. Before the evaluations were completed, Ian and Jane's counsel asked an attorney service to obtain court records of the dissolution of Tricia's first marriage. The documents obtained by the attorney service included a confidential custody evaluation of Tricia prepared under Evidence Code section 730 and Family Code former section 3111. Although the evaluation was labeled "confidential," Ian and Jane's counsel reviewed it and discovered Tricia had herself been molested as a child by her stepfather. Counsel thereafter used this information in deposing both Peter and Tricia.

In 2009 Peter's counsel discovered that Ian and Jane's attorneys had obtained access to the confidential report, and moved to disqualify Ian and Jane's attorneys. The family court granted Peter's motion. Because it believed

Liberman had been exposed to the information in the custody report, the family court also disqualified Liberman and appointed an new evaluator, Clark Clipson, Ph.D.

### c. *Clipson Report*

Clipson completed his evaluation in June 2010. Clipson concluded "there is no substantial risk of sexual abuse if [Ian] is allowed to have visits, supervised or not, with his grandchildren Susan and Nancy." However, Clipson's report and later testimony contain statements that in some respects are at odds with his ultimate conclusion.

Clipson's report states: "Reading [Linda's] own words prior to having conducted any interviews, I was certainly under the impression that this was a woman who had been the victim of sexual abuse. However, after conducting the entire evaluation, I am less certain of this."

Clipson's doubts about Linda's reporting were based on the fact that although Linda's brother, Richard, reported having been physically abused by his father and at the time Clipson interviewed him was estranged from Ian, Richard denied any sexual abuse took place in his parents' home. Clipson believed that if he was aware of abuse Richard would have had a motive to disclose it. Clipson also found it somewhat contradictory that both Linda and Ann would let Ian and Jane take care of their children. Clipson noted that at some points in her writing Linda recanted her accusations and that her accusations were sometimes general rather than specific.

Consistent with his conflicted views about Linda's reporting, when he testified at the family court hearing on Ian and Jane's petition, Clipson stated: "I understand why [Peter] is concerned. If I were in his position, I would have raised a stink, and filed a child abuse report, and been as concerned as well. [¶] So I don't feel he was coming out of left field about any of this . . . ." Peter's counsel then asked Clipson: "[P]utting aside the psychometric testing that you did, and just looking at the [documentary] evidence [and the] interviews with people . . . a reasonable parent, could have a reasonable fear that their child would be or could be subject to sexual abuse from [Ian]; is that correct?" Clipson responded in the affirmative.

The psychological testing Clipson administered was also somewhat inconclusive. Clipson did a number of psychological tests designed to determine whether Ian had any deviant sexual interests. On some of the tests, in which the questions are transparent to the subject, Ian fell within the normal range of heterosexual men. However, in response to the only test which used nontransparent questions designed to determine whether the subject has

characteristics consistent with child molesters, Ian achieved a raw score of 12, which placed him in what Clipson conceded on cross-examination was an uncertain area where the populations of normal men and child molesters overlap.

In this regard we note Peter presented testimony from Maram, who stated that in light of Linda's reports and the testing Clipson performed, he believed additional phallometry and polygraph testing was needed.

Clipson also interviewed Susan and Nancy and observed them with Ian. Prior to their supervised meeting with Ian, Clipson spoke to both girls about their grandfather. Both girls expressed reluctance to · be around him. Susan told Clipson: "We're not supposed to see him. (Why is that?) I don't know why. (Do you want to see him?) No. (Not ever?) Once in a while is OK, like this. I'm not comfortable with him. (Why is that?) He's done stuff. [¶] (What has he done that's made you uncomfortable?) Like while I'm changing. He'd stand in the doorway. I'd ask him to leave, but he wouldn't. He'd stare at me. I confronted my grandmother, but she wouldn't do anything. (Anything else?) He would rub powder on me in places I didn't like. It made me feel very uncomfortable. And he doesn't like my mother [(Tricia)]. [¶] (How do you feel about seeing him today?) I don't know. He cries sometimes, but I don't know if it's genuine or if he's trying to manipulate us. I feel torn. I want to see him, but it reminds me of things he's done I'm not OK with. [¶] . . . [¶]

"(Your grandfather will be here soon. How are you feeling?) I feel nervous. He cries and makes me feel bad. It feels fake. He calls me 'My precious.' It's too much, it's gross. He clings on to you. [¶] I don't like how he treats my grandmother. (How does he treat her?) Harshly, like she works for him. One time, I made a mess in his office and she said she needed to clean this up or he would fire her!"

Nancy told Clipson: "He picks me up, holds me tight, so I'm kicking to get down. He won't let go of me. I don't want to visit with him even if my grandmother and aunt are around. (How do you feel about visiting your aunt and grandmother?) I sometimes want to visit them. I feel they spoil us so we love them more than our own parents. [¶] (How do you feel about seeing your grandfather today?) It's awkward. I haven't seen him in a long time. He's like a stranger. I want him to see our haircuts."

Both girls told Clipson they did not want supervised visits with Ian or to try to work things out with him.

According to Clipson, after Ian arrived, although Susan initially seemed reticent and hesitant, both children interacted normally with him at a park and hugged him when they parted.

#### d. *Family Court's Order*

The family court accepted Clipson's evaluation of Ian and granted the section 3102 petition. The family court ordered that Ian, Jane and Ann be provided unsupervised weekend visitation in alternative months either in San Diego or near their home and a 10-day unsupervised visit during the summer. The family court found Peter's objection to contact with Ian was principally a matter of revenge and retaliation for Ian's success in the trust litigation. However, the family court also found Tricia, and her experience as the victim of child molestation, played a role in Peter's reaction to what Tricia perceived as the children's sexualized behavior. The family court concluded that Peter's concerns about Ian were not rational.

With respect to the attitudes of Susan and Nancy and their complaints about their grandfather, the family court stated: "Like most girls they were transitioning towards not wanting a Grandfather around while dressing or bathing. Prior to May 2007, Grandfather was informed by Grandmother as to Susan's preference for privacy and he had ceased being in the room when the children needed their privacy."

Finally, although Peter stated at the hearing on Ian and Jane's petition that he would voluntarily permit Jane and Ann to visit the girls, the family court found this representation was not credible in light of disputes which arose with respect to visitation during the pendency of the petition.

#### e. *Postorder Declaration*

Shortly before the family court's order was issued, Peter reported that the girls were increasingly opposed to their visits with their grandmother and aunt. Susan reported that during a June 2011 visit, Jane angrily took away her cell phone.

After the family court issued its order, Peter informed the girls about it and that their grandfather would be present for future visits. According to Peter, the girls reacted very negatively to this information. In a declaration Peter filed seeking ex parte relief from the family court's order, he stated: "As soon as the girls heard [Ian would be present] Nancy immediately started bawling and steadfastly said she refused to go down to San Diego. She asked how long would he be there for the trip. She said that she would be extremely uncomfortable around her grandfather and that she would lock herself in her room if she has to go down. [¶] Susan's eyes filled with tears, she would not—or perhaps could not—speak; it was as though she had become catatonic. For about an hour she said nothing; did not even express a word. She climbed under the covers in her stepbrother's room where they had been

playing video games. She looked to be in utter shock. This reaction was both [eerie] and frightening for a caring parent."

Shortly thereafter Peter filed his notice of appeal and the family court's visitation order was stayed.

## DISCUSSION

### I

Section 3102, subdivision (a) provides: "If either parent of an unemancipated minor child is deceased, the children, siblings, parents, and grandparents of the deceased parent may be granted reasonable visitation with the child during the child's minority upon a finding that the visitation would be in the best interest of the minor child." The cases which have considered application of section 3102 and other similar statutes in other states have substantially circumscribed the rights otherwise provided by the statute. (See *Troxel v. Granville* (2000) 530 U.S. 57, 67–72 [147 L.Ed.2d 49, 120 S.Ct. 2054] (*Troxel*); *Zasueta v. Zasueta* (2002) 102 Cal.App.4th 1242, 1251 [126 Cal.Rptr.2d 245] (*Zasueta*); *Punsly v. Ho* (2001) 87 Cal.App.4th 1099, 1106–1107 [105 Cal.Rptr.2d 139]; *Kyle O. v. Donald R.* (2000) 85 Cal.App.4th 848, 863 [102 Cal.Rptr.2d 476].)

██ In *Troxel*, the leading case on this issue, the court's plurality opinion articulated the principal limitation on application of grandparent visitation statutes, such as section 3102: " 'The law's concept of the family rests on a presumption that parents possess what a child lacks in maturity, experience, and capacity for judgment required for making life's difficult decisions. More important, historically it has recognized that natural bonds of affection lead parents to act in the best interests of their children.' [Citation.] [¶] Accordingly, so long as a parent adequately cares for his or her children (*i. e.*, is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." (*Troxel, supra*, 530 U.S. at pp. 68–69.)

In reversing an order which provided grandparent visitation more extensive than the surviving mother desired, the court in *Troxel* limited the power of courts in disputes over grandparent visitation: "In an ideal world, parents might always seek to cultivate the bonds between grandparents and their grandchildren. Needless to say, however, our world is far from perfect, and in it the decision whether such an intergenerational relationship would be beneficial in any specific case is for the parent to make in the first instance. *And, if a fit parent's decision of the kind at issue here becomes subject to*

*judicial review, the court must accord at least some special weight to the parent's own determination."* (*Troxel, supra,* 530 U.S. at p. 70, italics added.)

In light of *Troxel,* our courts have, for the most part, consistently upheld parental objections to grandparent visitation. In *Zasueta* a surviving mother objected to any visitation between her infant child and the child's paternal grandparents because of the uncleanliness of the grandparents' home and the grandparents' drinking and foul language. Notwithstanding the mother's objection, the family court ordered one-hour visits with the grandparents every other week, eventually increasing to two-hour visits. On appeal, the order was reversed. (*Zasueta, supra,* 102 Cal.App.4th at pp. 1253–1255.)

In finding that, contrary to the holding in *Troxel,* the family court in *Zasueta* had not given the mother's concerns sufficient deference the Court of Appeal stated: "Although the record supported a finding of parental fitness, the court 'failed to accord the determination of [Stephanie], a fit custodial parent, any material weight.' [Citation.] Instead, the court dismissed Stephanie's reasons for restricting visitation. For example, Stephanie expressed concern regarding the use of alcohol and inappropriate language in the Zasueta household. Without elaboration, the court commented that it took 'these allegations of drinking and swearing . . . with a grain of salt.' Although the court acknowledged Stephanie's concern regarding the cleanliness of the Zasuetas' home, the court accorded greater weight to the decision made by the parents of the Zasuetas' other grandchildren to allow visits. Finally, the court did not address Stephanie's observations that the minor child exhibited uneasiness around the Zasuetas, or that she would be dirty and throw tantrums when she returned from visits to their home." (*Zasueta, supra,* 102 Cal.App.4th at p. 1253.)

In *Punsly v. Ho,* the family court ordered a surviving mother to provide more extensive visitation than she believed was appropriate. The mother objected to the visitation because of foul language the grandparents used, disruption to the child's activities and the mother's conflict with the grandparents. Again, the family court's order was reversed because it did not give sufficient deference to the mother's views. (*Punsly v. Ho, supra,* 87 Cal.App.4th at p. 1110.)

In *Kyle O. v. Donald R., supra,* 85 Cal.App.4th at page 863, the dispute was over whether a surviving father could determine, on a flexible basis, visitation between his daughter and her maternal grandparents or whether the grandparents were entitled to a court-ordered visitation schedule. In reversing such a schedule, the court again found that the family court had not given adequate deference to the views of a fit parent. Importantly, the court stated: ". . . Kimberly's death did not imbue the grandparents with their daughter's

parental rights or diminish Kyle's parental rights. Nothing in the unfortunate circumstance of one biological parent's death affects the surviving parent's fundamental right to make parenting decisions concerning their child's contact with grandparents." (*Ibid.*)

## II

Evidence Code section 115 states: "Except as otherwise provided by law, the burden of proof requires proof by a preponderance of the evidence." Peter urges us to find an exception to Evidence Code section 115 and hold that in order to overcome the constitutional presumption in favor of his decision to prevent any visitation with Ian and limit it with Jane and Ann, his former in-laws were required to present clear and convincing proof visitation was in Susan's and Nancy's best interests. (See *Rich v. Thatcher* (2011) 200 Cal.App.4th 1176, 1181 [132 Cal.Rptr.3d 897] (*Rich*).)

■ We recognize that both the plurality in *Troxel* and the majority in *In re Marriage of Harris* (2004) 34 Cal.4th 210 [17 Cal.Rptr.3d 842, 96 P.3d 141] (*Harris*), counseled that in this area courts proceed with caution: " '[W]e agree with JUSTICE KENNEDY that the constitutionality of any standard for awarding visitation turns on the specific manner in which that standard is applied and that the constitutional protections in this area are best "elaborated with care." ' " (*Id.* at p. 228, quoting *Troxel, supra,* 530 U.S. at pp. 72–73.) Nonetheless on this record we agree with Peter that in light of the nature of his concerns and the relief granted by the trial court, Ian, Jane and Ann were required to show by clear and convincing proof that the visitation ordered by the trial court was in the best interests of Susan and Nancy.

Proof by clear and convincing evidence has been required by our Supreme Court " 'where particularly important individual interests or rights are at stake,' such as the termination of parental rights, involuntary commitment, and deportation." (*Weiner v. Fleischman* (1991) 54 Cal.3d 476, 487 [286 Cal.Rptr. 40, 816 P.2d 892].) The standard of proof often depends on the " 'gravity of the consequences that would result from an erroneous determination of the issue involved.' " (*Ibid.*) In his concurring and dissenting opinion in *Harris*, Justice Chin argued that any infringement on a custodial parent's right to direct her child's upbringing was "unconstitutional absent *clear and convincing evidence* to rebut the presumption under section 3104, subdivision (f), that such visitation is not in the child's best interests." (*Harris, supra,* 34 Cal.4th at p. 235 (conc. & dis. opn. of Chin, J.), italics added.)

Justice Chin stated: " 'The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to "instruct the factfinder concerning the degree of confidence our society thinks

[the factfinder] should have in the correctness of factual conclusions for a particular type of adjudication." [Citation.] The standard serves to allocate the risk of error between the litigants and to indicate the relative importance attached to the ultimate decision.' [Citations.] As the high court has explained, where 'society has a minimal concern with the outcome' of a case—such as with 'the typical civil case involving a monetary dispute between private parties'—the 'preponderance' standard applies. [Citation.] Application of this relatively low standard reflects society's 'minimal concern' in these cases by allocating the risk of error 'in roughly equal fashion.' [Citations] [¶] On the other hand, in civil cases where '[t]he interests at stake . . . are . . . more substantial than mere loss of money,' the 'clear and convincing evidence' standard applies. [Citation.] Because society has a greater concern with the outcome of these cases, we apply a standard of proof 'requiring that the evidence be " 'so clear as to leave no substantial doubt'; 'sufficiently strong to command the unhesitating assent of every reasonable mind.' " [Citation.]' [Citation.] . . . . As the high court has explained, 'adopting a "standard of proof is more than an empty semantic exercise." [Citation.] In cases involving individual rights, whether criminal or civil, "[the] standard of proof [at a minimum] reflects the value society places on individual liberty." [Citation.]' " (*Harris, supra,* 34 Cal.4th 210 at pp. 248–249 (conc. & dis. opn. of Chin, J.).)

Justice Chin also noted that the "best interests" determination required under the grandparent visitation statute has been repeatedly criticized as imprecise and unusually open to the subjective values of a judge. (*Harris, supra,* 34 Cal.4th at pp. 248–249 (conc. & dis. opn. of Chin, J.).) In Justice Chin's view "best interests" determinations are therefore subject to a heightened risk of error. (*Id.* at pp. 249–250.)

Because a parent's interest in directing a child's upbringing is both fundamental and compelling and there is a heightened risk of error in determining a child's best interest, Justice Chin concluded a clear and convincing evidence standard .of proof must be applied in determining whether grandparent visitation should be ordered over the objection of a child's custodial parent. (*Harris, supra,* 34 Cal.4th at pp. 249–250 (conc. & dis. opn. of Chin, J.).)

In *Rich,* the family court applied a clear and convincing evidence standard of proof and denied a grandparent visitation petition. In affirming, the Court of Appeal relied on Justice Chin's opinion in *Harris* and stated: "There is no question that a grandparent has an important interest in visiting with a grandchild. But the higher degree of the burden of proof that we adopt simply demonstrates that there is a preference in favor of the presumably correct choice of a fit sole surviving parent. Such a choice is 'first.' " (*Rich, supra,* 200 Cal.App.4th at p. 1180.)

Here, there can be little question as to the important interests at stake. The nature of the risks Peter has raised are of course profound. Moreover, the lengthy unsupervised visitation Ian, Jane and Ann sought and were given represents a substantial invasion and derogation of Peter's role as a parent. Under the family court's order and by virtue of the hostility between the parties, when the children visit their mother's relatives Peter will have little practical ability to fulfill his primary role of protecting them from harm. This is not a case, such as *Troxel, Punsly v. Ho* and *Kyle O. v. Donald R.*, where there was no dispute that the grandparents would have contact with their grandchildren but only disagreement about the extent of that contact.

The risk of error here is also fairly substantial. Not only was the family court required to make a very subjective determination, but the inferences arising from the evidence were sharply conflicting. Given the interests at stake and the constitutional preference for his decisionmaking, Peter should not share equally in that heightened risk of error. (See *Harris, supra,* 34 Cal.4th at pp. 248–249 (conc. & dis. opn. of Chin, J.).) Thus, in this case we have no difficulty in holding that the family court's order required clear and convincing proof that the visitation it requested was in the best interests of Susan and Nancy.

III

We note the requirement of clear and convincing evidence applies only in the trial court. (9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 371, p. 428.) "The judge may reject a showing as not measuring up to the standard, but, if the judge decides in favor of the party with this heavy burden, the clear and convincing test disappears. On appeal, the usual rule of conflicting evidence is applied . . . ." (*Ibid.*) We are obligated to affirm the trial court's determination so long as it is supported by substantial evidence. (*Ibid.*) In particular we are not required to find *more* substantial evidence to support the trial court's finding "than we would if the burden of proof had been only a preponderance of the evidence." (*In re Marriage of Murray* (2002) 101 Cal.App.4th 581, 604 [124 Cal.Rptr.2d 342].)

On the other hand, where the record shows that the trial court failed to apply the clear and convincing standard of proof, we may reverse and remand with instructions the trial court determine the issue under the appropriate standard of proof. (See *Estate of Chambers* (2009) 175 Cal.App.4th 891, 896–897 [96 Cal.Rptr.3d 651].) Here, the record does not affirmatively suggest the family court applied the clear and convincing standard of proof. We note that at the time the family court made its findings neither it nor the parties had the benefit of the opinion in *Rich* and that in making its ruling it made reference to the sharply conflicting inferences raised in the record.

These circumstances suggest that Peter was not given the benefit of the constitutionally required standard of proof in the family court.

However, we decline to remand this case for further proceedings so that we can be certain that the appropriate standard of proof was applied. As we have indicated, our review of the sufficiency of the evidence is unaffected by the standard of proof employed in the family court. (See Witkin, Cal. Procedure, *supra*, § 371, p. 428.) We are also, as we are required to be, very mindful of the burden further litigation would place on these parties and Peter's due process rights. (See *Troxel, supra*, 530 U.S. at p. 75.) Importantly, as we explain, our review of the record convinces us that the family court had no power—whether applying a preponderance of the evidence standard or a clear and convincing proof standard—to order extended unsupervised visitation with Ian. Thus there is no reasonable probability that on remand the family court would properly order such visitation.

## IV

■ Under either standard of proof—preponderance of the evidence or clear and convincing proof—Ian, Jane and Ann face a considerable challenge in overcoming the presumption a parent's decision to limit or prevent contact is in a child's best interest. In our view the major impediment is the breadth of circumstances a parent may reasonably consider in deciding to limit or prevent contact with a grandparent. As we have seen in *Zasueta*, the family court erred in failing to give deference to a parent's concerns about the cleanliness of the grandparents' home, their drinking and their swearing; in *Punsly v. Ho*, the court found that a parent's concerns about foul language, disruption of a child's activities and conflict with the grandparent were legitimate reasons to limit visitation; in *Kyle O. v. Donald R.*, the parent's desire that his daughter have a flexible and spontaneous relationship with her maternal grandparents was sufficient to overcome the grandparents' desire for a fixed visitation schedule. Plainly, in the context of a dispute between *parents* over custody and visitation these kinds of concerns would not be decisive; however, as the court in *Kyle O. v. Donald R.* pointed out, grandparents, notwithstanding whatever tragedy might give rise to their particular claims, do not have parental rights and a parent's concerns about such matters are sufficient to withstand the desires of grandparents.

Here, the family court appears to have made precisely the error identified in *Kyle O. v. Donald R.* It acted as if Ian and Jane had the rights of a parent in a dissolution proceeding.[4] This error is most manifest in the family court's

---

[4] In this regard we find telling that in its statement of decision the family court made the following determination: "The court finds the level of conflict between Grandparents, Maternal

failure to recognize the significance of Clipson's concession that a reasonable parent in Peter's position would have legitimate concerns about Ian. The question before the family court was not, as would be the case in a custody dispute between two parents, whether Ian was a substantial risk to his granddaughters. Rather the only questions the family court was required to determine were whether Peter was a fit parent and if he was, whether Ian and Jane had overcome the presumption that Peter's decision to prevent contact with Ian was in the best interest of his daughters. (See *Troxel, supra,* 530 U.S. at pp. 66–70.)

There is nothing in the record to suggest Peter was not a fit parent and Ian, Jane and Ann have never questioned his fitness. Thus the sole issue the family court was required to determine was whether Ian, Jane and Ann overcame the presumption favoring Peter's decision.

In light of Clipson's conclusion that Peter's concerns were legitimate, a conclusion consistent with the concerns expressed by the two therapists who had treated Linda—Marcus and Galant—Ian, Jane and Ann could not overcome the presumption favoring Peter's decision to prevent contact with Ian. Given the expert opinions which validated the legitimacy of Peter's concerns, the family court erred in finding there was no reasonable basis for his decision.

We note the family court believed Peter was motivated in large part by anger growing out of his dispute with Ian over the proceeds of Linda's life insurance policy. We do not doubt that in the absence of their financial dispute, Peter may have been open to alternative interpretations of Linda's written and oral statements. However, given the dramatic nature of Linda's statements, the advice Peter received from the therapists who had treated Linda and Clipson's conclusion that Peter "was [not] coming out of left field," the family court could not find that Peter's concerns had no rational basis.

As a fit parent, Peter was not required to accept Clipson's overall resolution of what Clipson himself conceded was dramatically conflicting information. Given the high stakes involved, Peter could reasonably conclude that if any substantial portion of Linda's explanation of her own very profound

Aunt and Father is such that it is not conducive to the sharing of *joint legal custody*. It is therefore not in the children's best interest for the parties *to share legal custody of the children.*" Section 3102 neither expressly nor by implication provides grandparents with any *custodial* rights. (See *Kyle O. v. Donald R., supra,* 85 Cal.App.4th at p. 860.) The fact the family court felt it necessary to determine broad custodial rights which do not exist plainly undermines confidence that in considering the grandparents' visitation petition the family court accorded Peter's views any of the special weight provided by the court in *Troxel, supra,* 530 U.S. 57.

emotional illness was true, his children were better off having no contact with Ian. In protecting their children from harm, parents are not limited to consideration of hazards which are certain; fit parents may also protect their children from risks which, although not certain to occur, are grave.[5]

■ Just as important, in our view, the family court also erred in failing to give any appreciable weight to the views of Susan and Nancy. When custody is in dispute, section 3042 provides that when "a child is of sufficient age and capacity to reason so as to form an intelligent preference as to custody or visitation, the court shall consider, and give due weight to, the wishes of the child." The record here shows that although both girls made complaints about Ian which echoed both Linda's and Ann's complaints about him and expressed their preference not to visit him, the family court gave virtually no consideration to their wishes. Where, as here, the visitation rights of a grandparent or other relative are at issue, in determining the best interests of a child the family court must give substantial weight to the wishes of the child. It is difficult to accept the proposition that compelling nine- and 13-year-old children to visit relatives they do not wish to see is somehow in their best interests. While such compulsion might be necessary when *parental rights* are at issue, the rights of nonparental relatives will rarely, if ever, justify a visitation order children themselves repeatedly and adamantly oppose.

■ In sum, the family court's order must be reversed. In requiring unsupervised visitation with Ian, it unlawfully intrudes on Peter's right to make decisions with respect to his daughters' well-being and does not reflect any meaningful consideration of the girls' wishes.

## V

In both *Troxel* and *Punsly v. Ho* orders requiring grandparent visitation were not only reversed, but the respective reviewing courts also directed that no further proceedings take place on remand. (*Troxel, supra*, 530 U.S. 75; *Punsly v. Ho, supra*, 87 Cal.App.4th at p. 1111.) As the court in *Troxel* stated, "the burden of litigating a domestic relations proceeding can itself be 'so disruptive of the parent-child relationship that the constitutional right of a custodial parent to make certain basic determinations for the child's welfare becomes implicated.' " (*Troxel*, at p. 75.)

Here, any further proceedings on remand would also implicate Peter's constitutional rights and the best interests of Susan and Nancy. We note Susan

---

[5] In this regard the record here is distinguishable from the one considered in *Hoag v. Diedjomahor* (2011) 200 Cal.App.4th 1008, 1010 [132 Cal.Rptr.3d 256]. There the father articulated no reason for objecting to court-ordered visitation with the maternal grandmother other than mutual hostility. (*Id.* at pp. 1018–1019.)

and Nancy have been living in another part of the state for more than five years and that, with one exception, they have not had contact with Ian during that time, and they have not had contact with Jane or Ann over the last 16 months. We also note that the girls have expressed unwillingness to visit their grandmother and aunt in San Diego. Given their new lives outside San Diego, their resistance is entirely understandable. We also note, as did the family court, the high level of conflict between Peter and his former in-laws. Perpetuating that conflict, which is now in its sixth year, by way of further proceedings in the family court would serve no one's interests. Thus, as in *Troxel* and *Punsly v. Ho*, any remand for further proceedings is inappropriate.

## CONCLUSION

We emphasize that we have made no judgment with respect to whether Ian is in fact a substantial risk to his grandchildren or any other children. However, as we have explained, in the context of a petition under section 3102, Clipson's concession that Peter's concerns are legitimate, as well as the concerns expressed by the other experts, shields Peter's parenting decision from judicial review.

## DISPOSITION

The family court's order granting Ian, Jane and Ann's petition is reversed with directions that it be denied. Peter to recover his costs of appeal.

McConnell, P. J., and Aaron, J., concurred.